2003 UT 22

**STATE of Utah, Plaintiff and Appellee,**

v.

**Tony Alexander HAMILTON, Defendant and Appellant.**

**No. 20000465.**

Supreme Court of Utah.

May 9, 2003.

Mark L. Shurtleff, Att'y Gen., Laura B. Dupaix, Brett J. Delporto, Asst. Att'ys Gen., Salt Lake City, for plaintiff.

Keith C. Barnes, Salt Lake City, for defendant.

DURRANT, Associate Chief Justice:

¶ 1 Tony Alexander Hamilton was convicted of criminal trespass, attempted aggravated murder, aggravated assault, killing a police service dog, and interference with an arresting officer. Hamilton raises numerous issues on appeal. He contends that (1) the trial court erred in submitting the criminal trespass charge to the jury as a question of fact; (2) the trial court erred by not dismissing the criminal trespass charge under the doctrine of equitable estoppel; (3) the evidence was insufficient to support the jury's verdict for criminal trespass; (4) the evidence was insufficient to submit the charges of attempted aggravated murder, aggravated assault, and killing a police service dog to the jury; (5) the trial court erred by giving a jury instruction that limited the jury's consideration of self-defense and justification as defenses on the attempted aggravated murder charge; and (6) the trial court's errors require a reversal under the cumulative error

doctrine. Finding no error by the trial court, we affirm.

## BACKGROUND

¶ 2 We relate the facts and "all reasonable inferences that may be drawn [therefrom] in a light most favorable to the verdict." *State v. Dunn*, 850 P.2d 1201, 1212 (Utah 1993); *accord State v. Dibello*, 780 P.2d 1221, 1224 (Utah 1989).

## I. THE FRATERNITY OF PREPARATION AND THE VANCE SPRINGS PROPERTY

¶ 3 In 1985, the defendant, Tony Alexander Hamilton, and several other Salt Lake City families formed a religious organization named the Fraternity of Preparation (the "Fraternity"). As a refuge where they could observe their beliefs of self-sufficiency and governance, the group purchased an isolated 640–acre tract in the northwest corner of Beaver County, Utah, known as Vance Springs. Members of the Fraternity relocated there in 1985 and began improving the land and constructing homes and other buildings. Within that same year, however, Hamilton left both the Fraternity and Vance Springs due to a disagreement with Fraternity members. Hamilton rejoined the Fraternity at Vance Springs approximately six years later.

## II. THE TAX AND PROPERTY DISPUTES

¶ 4 After purchasing Vance Springs, the Fraternity deeded it to the Immanuel Foundation, a non-profit association set up to hold the Fraternity's property.[1] The Fraternity then filed a document with the Beaver County (the "County") Recorder's Office *declaring* that it was a religious organization exempt from state taxation. County officials promptly informed the Fraternity that its declaration was ineffective and that it needed to apply for tax exempt status formally be-

---

1. For clarity, we will refer to the Fraternity and the Immanuel Foundation collectively as the "Fraternity."

fore property taxes could be waived.[2] The Fraternity refused.[3] During the next several years, County officials repeatedly encouraged Fraternity leaders to either apply for tax exempt status or pay the property taxes on Vance Springs. The Fraternity did neither.

¶ 5 In 1990, the County notified the Fraternity that Vance Springs would be sold at a tax sale unless the property taxes were paid. The Fraternity refused "on principle," insisting that it owed no taxes and was not required to apply for tax exempt status. In 1991, the County published notice of a tax sale and sold the Vance Springs property. After discovering a citation error [4] in the tax sale notice, however, the County rescinded the sale before the deed was finalized because the county attorney believed that the error would void any sale under Utah's forfeiture laws.

¶ 6 Over the next three years, the County renewed its efforts to resolve the tax dispute with the Fraternity, but its efforts were fruitless. The Fraternity persisted with its original tax position and filed several lawsuits in state and federal courts seeking validation, but had no success.[5]

¶ 7 In 1994, the County sold Vance Springs to Ranger Enterprises in a second tax sale for the amount of taxes due, approximately $15,000. This time the tax sale notice referred to the correct statutory citation; however, the acknowledgment portion of the tax deed cited the same erroneous code section contained in the 1991 notice. Hamilton and other Fraternity members believed that the 1994 tax sale was invalid and continued to occupy Vance Springs and to make improvements to the land.

¶ 8 In 1995, Ranger Enterprises brought a quiet title action against the Fraternity. Fraternity leaders attempted to represent the Fraternity in the suit, but the Fifth District Court prohibited them from doing so because they were non-lawyers. When the Fraternity refused to retain counsel, the court entered a default judgment against it. The district court also issued a writ of restitution that ordered Fraternity members to vacate the property and enjoined them from re-entering Vance Springs.

### III.  HAMILTON'S RETURN TO VANCE SPRINGS

¶ 9 About the time the County published notice of the 1991 tax sale, defendant Hamilton rejoined the Fraternity at Vance Springs. By this time, Hamilton was aware of the tax dispute between the Fraternity and the County, and he held the Fraternity's belief that religious organizations are inherently tax exempt. Consequently, Hamilton continued to occupy Vance Springs with several other Fraternity members until mid–1996. In July of that year, pursuant to a quiet title judgment and writ of restitution obtained by Ranger Enterprises, Beaver County sheriff's deputies went to Vance Springs to evict any trespassing Fraternity members. The deputies removed everyone from Vance Springs except for Hamilton, who eluded them by hiding in some trees. Several officers returned in September 1996 to remove Hamilton from the property. When he refused to leave voluntarily, the officers arrested him for criminal trespass. A jury convicted Hamilton on several counts of criminal trespass, and the trial court sentenced him to a one-year probation on the condition that he stay away from Vance Springs.

2.  Several Beaver County officials—including the county commissioners, the county recorder, the county assessor, and the county attorney—met with Fraternity leaders during this time and explained how to apply for tax exempt status.

3.  The Fraternity believed that § 508(c)(1)(a) of the Internal Revenue Code automatically granted it tax exempt status. This section exempts "churches, their integrated auxiliaries, and conventions or associations of churches" from having to apply to the Secretary of the Treasury in order to attain federal tax exempt status under

26 U.S.C. § 501(c)(3). 26 U.S.C. § 508(c)(1)(a) (2002).

4.  The tax notice erroneously cited to Utah Code Ann. § 59–10–64. Although the tax sale provision was previously contained in that section, by 1991, the tax sale provision had been renumbered as section 59–2–1363 and then replaced by section 59–2–1351.

5.  Several of the suits were dismissed on procedural grounds because the Fraternity had not paid the taxes in dispute.

¶ 10 About a year after Hamilton's conviction for trespass, he resumed his efforts to assert ownership of the Vance Springs property by recording documents regarding the property.[6] Then in 1999, he filed a criminal trespass suit against Ranger Enterprises in federal district court and asked the court to determine the true owner of the property. Apparently believing that his "work" at the recorder's office had created sufficient ownership uncertainty, Hamilton and two other Fraternity members returned to Vance Springs in July 1999 without a ruling from the court.

¶ 11 In August 1999, Ranger Enterprises filed a second quiet title action naming Hamilton. Hamilton was served with the summons and complaint but disregarded them because his name appeared in all capital letters in the caption.[7] When Hamilton did not respond to or appear in the quiet title action, the trial court entered a default judgment against him and declared that he had "no right, title, or interest" in Vance Springs. Hamilton did not appeal the judgment. Ranger Enterprises subsequently asked the sheriff's department to arrest anyone who continued to trespass on Vance Springs.

## IV. HAMILTON'S ARREST

¶ 12 On September 9, 1999, four uniformed officers went to Vance Springs to make sure everyone had left the property and to arrest anyone who remained. Sheriff Kenneth Yardley and Deputy Raymond Goodwin drove in one vehicle, Deputy Jim White drove alone, and Deputy John Chambers drove in a truck accompanied by his certified police dog, Max. While Chambers surveyed the property, Yardley, Goodwin, and White met at the south gate of Vance Springs. As the three officers entered the property and walked up the main road, they saw a blue pickup truck driving away from them and suspected that the driver was Hamilton. The officers radioed Chambers and instructed him to intercept the blue pickup truck at the north gate.

¶ 13 Finding the north gate locked and barricaded, Chambers climbed over the fence while his dog, Max, went under the fence. Chambers and Max headed southwest toward a nearby pond and rock house where Chambers had seen a stockpile of weapons on a previous occasion. Chambers spied Hamilton and the blue truck a short distance from the rock house. When Hamilton spotted the deputy, he got in his truck and drove to within ten feet of Chambers. Chambers attempted to approach and talk with him, but Hamilton warned, "That's close enough, Chambers." Chambers continued to approach the truck and repeatedly directed Hamilton to stop the vehicle. In response, Hamilton revved the truck's engine and drove past Chambers. When Chambers realized Hamilton was not going to stop, he drew his sidearm and shot out the front and rear left tires. Hamilton did not stop, however, until he had driven about 300 yards.

¶ 14 After Hamilton pulled over, he got out of the truck and aimed his scoped rifle at Max. Chambers called Max to him, warning Hamilton not to shoot. Ignoring this warning, Hamilton shot and fatally wounded Max as Max was running back to Chambers. Chambers testified that Hamilton then fired two shots at him, which prompted Chambers to return fire while running for cover. Hiding behind his truck, Hamilton continued firing until he shot and severely wounded Chambers in the leg.[8] Hamilton then grabbed more ammunition from his truck and headed south on foot.

¶ 15 Hearing the gunshots, Sheriff Yardley rushed toward the sound. On the way, Yardley spotted Hamilton and attempted to intercept him. However, when he was within

---

**6.** In November 1997, he filed two Declarations of Land Patent. In March 1999, he recorded another Declaration of Land Patent and a warranty deed purporting to transfer Vance Springs from Immanuel Foundation to himself. In April 1999, he recorded a second warranty deed purporting to convey Vance Springs to himself.

**7.** Hamilton believed that spelling a name in all capital letters signified that the person was either dead or fictitious (e.g., a corporation). Under this belief, he reasoned that he was not the person named in the summons and complaint.

**8.** By the time Chambers reached the hospital, he had lost more than half his blood volume and was "near death."

about seventy yards, Hamilton warned, "That's close enough." Because Hamilton was pointing his rifle at him, Yardley perceived the warning as a threat and stopped. Since communication was difficult at this range, Hamilton allowed Yardley to move closer, but continued to train his rifle on him. When Yardley was within approximately thirty yards of Hamilton, Hamilton again told him not to come any closer. The two talked and Hamilton admitted that he shot Chambers. After speaking with Hamilton for a while, Yardley asked him to point his rifle elsewhere. Hamilton did so but he still kept the rifle in firing position, with his hands near the trigger. Deputy White soon approached with his hands in the air and joined the conversation. After a while, Hamilton stated that he was through talking, put his gun over his shoulder, and walked away. The two officers followed him and attempted to talk with him. When an opportunity arose, White tackled Hamilton and the two officers subdued and arrested him.

¶ 16 The State charged Hamilton with criminal trespass, attempted aggravated murder,[9] aggravated assault, interference with an arresting officer, and killing a police service dog. At the close of the State's case in chief, Hamilton moved to dismiss all of the charges except interference with an arresting officer. He claimed there was insufficient evidence to warrant submitting these charges to the jury. The trial court denied his motion. Subsequently, a jury convicted Hamilton on all of the charges listed above. He appeals his convictions on numerous grounds. We have jurisdiction pursuant to Utah Code Ann. § 78–2–2(3)(i) (2002).

## ANALYSIS

### I. STANDARD OF REVIEW

¶ 17 The grant or denial "of a motion to dismiss is a question of law [that] we review for correctness, giving no deference to the decision of the trial court." *Krouse v. Bower*, 2001 UT 28, ¶ 2, 20 P.3d 895 (citation omitted); *State v. Horrocks*, 2001 UT App 4, ¶ 10, 17 P.3d 1145 (citation omitted). When our review "requires us to examine statutory language, we look first to the plain meaning of the statute." *Young v. Salt Lake City Sch. Dist.*, 2002 UT 64, ¶ 10, 52 P.3d 1230.

¶ 18 In reviewing a jury verdict, we view "the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict." *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116. "We reverse a jury verdict only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *State v. Dunn*, 850 P.2d 1201, 1212 (Utah 1993) (citations omitted).

### II. CRIMINAL TRESPASS

#### A. Motion to Dismiss at the Conclusion of the State's Case in Chief

¶ 19 Hamilton challenges his criminal trespass conviction by asserting that the trial court erred in submitting that charge to the jury because the court should have determined that Hamilton was lawfully present on the Vance Springs property as a matter of law. We disagree.

#### 1. Elements of Criminal Trespass

¶ 20 To prove criminal trespass, the State must establish that the defendant (1) "enter[ed] or remain[ed] unlawfully on property," and (2) had the intent "to cause annoyance or injury to any person or damage to any property." Utah Code Ann. § 76–6–206(2)(a) (1999).[10] Under the statute, "[a] person 'enters or remains unlawfully' ... when the premises or any portion thereof at the time of the entry or remaining are not

---

9. In addition to being charged with the attempted aggravated murder of Deputy Chambers, Hamilton was also charged with the attempted aggravated murder of Deputy Goodwin. Since the jury acquitted Hamilton of the second attempted aggravated murder charge, it is not at issue on this appeal. Thus, all references to the attempted aggravated murder charge in this opinion relate solely to the attempted aggravated murder of Chambers.

10. Throughout this opinion, we cite the statutory code provisions that were in effect at the time the crimes were committed.

open to the public and *when the actor is not otherwise licensed or privileged to enter or remain on the premises* or such portion thereof." *Id.* § 76–6–201(3) (1999) (emphasis added). Hamilton only challenges the evidence with regard to the "unlawful" element of the statute.

### 2. Validity of the 1994 Tax Deed

¶ 21 At trial, the State produced six pieces of evidence supporting Ranger Enterprises' ownership of Vance Springs and Hamilton's unlawful presence thereon: (1) the 1994 tax deed, (2) the 1995 quiet title judgment against the Fraternity, (3) the 1996 writ of restitution ordering members of the Fraternity to vacate the property, (4) Hamilton's 1996 trespass convictions, (5) the 1999 quiet title judgment against Hamilton, and (6) the testimony of the owner of Ranger Enterprises that Hamilton did not have permission to be on the property.

¶ 22 Despite this evidence, at the close of the State's case in chief, Hamilton moved to dismiss the criminal trespass charge. He argued that the trial court should rule as a matter of law that the 1994 tax deed was void and that he was the lawful owner of the property. The court denied his motion, concluding, based on the evidence produced by the State, that the criminal trespass charge should be submitted to the jury as a question of fact.

¶ 23 On appeal, Hamilton reasserts this same argument. He contends that since the 1994 tax deed cited to an erroneous statute, the 1994 tax sale was void as a matter of law. Hence, the trial court erred in submitting the criminal trespass charge to the jury. We disagree.

¶ 24 Essentially, Hamilton asks this court to legally undo the series of judgments and actions that occurred after the 1994 tax sale because the 1994 tax deed allegedly was invalid as a matter of law. He believes that removing the 1994 lynchpin event will derail the validity of each subsequent proceeding on Vance Springs. Hamilton misapprehends

the law. Even if the 1994 tax deed were technically invalid, Hamilton's argument fails because it constitutes an impermissible collateral attack on the quiet title judgments. Thus, we need not reach the issue of whether an incorrect statutory citation in a tax deed invalidates a tax sale.

### 3. Impermissible Collateral Attack

¶ 25 With rare exception, when a court with proper jurisdiction enters a final judgment, including a default judgment, that judgment can only be attacked on direct appeal. *See Olsen v. Bd. of Educ. of Granite Sch. Dist.*, 571 P.2d 1336, 1338 (Utah 1977). In *Collins v. Sandy City Board of Adjustment,* we reaffirmed the rationale disfavoring collateral attacks: "[T]he interest of the state requires that there be an end to litigation—a maxim which comports with common sense as well as public policy." 2002 UT 77, ¶ 19, 52 P.3d 1267 (quotations and citation omitted). Thus, Hamilton may not collaterally attack the validity of the 1994 tax deed because the 1995 and 1999 actions by Ranger Enterprises effectively quieted title [11] against Hamilton and the Fraternity.

¶ 26 In addition to attacking the 1994 tax deed, however, Hamilton also attacks the validity of the 1999 quiet title default judgment against him. He contends that he was not properly named in the summons and complaint because his name was spelled in all capital letters, that is "TONY–ALEXANDER HAMILTON." In his view, a name written in all capital letters may only denote a fictitious (corporate) or deceased person. Since he is neither fictitious nor deceased, Hamilton reasons that he was not the person named in the summons, and therefore the judgment was invalid. By arguing that the 1999 quiet title action was invalid, Hamilton hopes to transform his collateral attack on the 1994 tax deed into a direct attack appropriate for our consideration. His argument is without merit.

---

11. Quiet title actions serve a public interest similar to the rule against collateral attacks. They provide land owners with repose from adverse claims to their property. *See Spanish Fork W.*

*Field Irrigation Co. v. Salt Lake County,* 99 Utah 558, 573, 110 P.2d 344, 351 (Utah 1941) (Trueman, J., dissenting in part).

¶ 27 Section 78–40–13 of the Utah Code governs default judgments in quiet title actions. It specifies that a default "judgment shall be conclusive against all the persons named in the summons and complaint who have been served." Utah Code Ann. § 78–40–13 (2002). The statute's plain language clearly provides that if a person is properly named in the summons and complaint and served, a default judgment is valid and conclusive against him or her.

¶ 28 In this case, Hamilton was properly named in the summons and complaint and properly served. Rule 4(c)(1) of the Utah Rules of Civil Procedure requires a summons to contain "the names of the parties to the action." Utah R. Civ. P. 4(c)(1). Contrary to Hamilton's assertion, merely presenting the names of the parties in all capital letters does not create a substantive defect in the summons. *See Jaeger v. Dubuque County*, 880 F.Supp. 640, 643 (N.D.Iowa 1995) (finding a similar capitalization argument specious). Rule 4 focuses on the content of a summons, not its cosmetic appearance. Its underlying purpose is to ensure notice that is "reasonably calculated, under all the circumstances, to apprise the interested parties of the pendency of the action." Utah R. Civ. P. 4(d)(4)(B). Consequently, we construe the technical requirements of Rule 4 in light of this guiding principle.

¶ 29 While technical accuracy is preferred, the United States Supreme Court long ago held that "even in names, 'due process of law' does not require ideal accuracy." *Grannis v. Ordean*, 234 U.S. 385, 395, 34 S.Ct. 779, 58 L.Ed. 1363 (1914). Rather, the test is whether the party, "upon receiving the notice, would be sufficiently warned that it affected his interest." *Id.* at 398, 34 S.Ct. 779.

¶ 30 Here, the summons and complaint clearly apprised Hamilton of the action. Additionally, he was personally served with the summons and complaint, which were intended for him and which properly spelled his name. Although he chose to ignore the summons because it was written in a manner disagreeable to him, he did so at his own risk. He cannot now attack the 1999 judgment because he chose to ignore a summons that sufficiently warned him of an action affecting his interest in the Vance Springs property. *See id.* Hence, the default judgment is conclusive against Hamilton.

¶ 31 In sum, Hamilton's claim that the 1994 tax deed was void as a matter of law constitutes an impermissible collateral attack on later judgments. Regarding his specific attack on the 1999 quiet title action, Hamilton had an opportunity to challenge Ranger Enterprises' claim that he had no legal interest in the property, but he chose not to do so. Moreover, he could have either directly appealed the default judgment or filed a motion to have it set aside pursuant to Rule 60(b) of the Utah Rules of Civil Procedure, but he did neither. Because Hamilton failed to use any of the available legal avenues for challenging the 1999 judgment or the 1994 tax deed, he has waived any right to argue that either was invalid. Hence, we hold that the trial court did not err in its application of the law and that it was proper to submit the criminal trespass charge to the jury as a question of fact.

### B. Equitable Estoppel Claim

¶ 32 In the alternative to his claim that the trial court erred in submitting the criminal trespass charge to the jury as a question of fact, Hamilton asserts that the State should have been equitably estopped from proceeding forward with the charge against him. We disagree.

¶ 33 Hamilton's equitable estoppel claim "is a mixed question of law and fact."[12] *Nunley v. Westates Casing Servs., Inc.*, 1999 UT 100, ¶ 31, 989 P.2d 1077. When an issue "involves a mixed question of [law and fact], we afford some measure of discretion to the [trial] court's application of the law." *State v. Hansen*, 2002 UT 125,

---

**12.** "A mixed question involves 'the application of law to fact or, stated more fully, the determination of whether a given set of facts comes within the reach of a given rule of law.'" *State v.*

*Hansen*, 2002 UT 125, ¶ 26 n. 3, 63 P.3d 650 (quoting *State v. Pena*, 869 P.2d 932, 936 (Utah 1994)).

¶ 26, 63 P.3d 650 (citing *State v. Pena*, 869 P.2d 932, 937 (Utah 1994)). "The measure of discretion afforded varies, however, according to the issue being reviewed." *Id.* (citing *Pena*, 869 P.2d at 937–38). When reviewing a trial court's legal conclusions on the issue of estoppel, we afford the court "broad discretion." *Nunley*, 1999 UT 100 at ¶ 31, 989 P.2d 1077 (citation omitted).

¶ 34 To prevail on an equitable estoppel claim, a defendant must prove that (1) a party made "a statement, admission, act, or failure to act ... inconsistent with a claim later asserted;" (2) defendant changed his position or took action in reliance on that "statement, admission, act, or failure to act;" and (3) the defendant's reliance would operate to his detriment if the court allowed the other "party to contradict or repudiate" its earlier "statement, admission, act, or failure to act." *CECO Corp. v. Concrete Specialists, Inc.*, 772 P.2d 967, 969–70 (Utah 1989).

¶ 35 Here, Hamilton contends that the trial court erred in allowing the State to proceed forward with its criminal trespass charge against him. He contends that since the County rescinded the 1991 tax sale due to an erroneous statutory citation in the tax notice, the State should have been estopped from proceeding with the criminal trespass charge against him "on the basis of the 1994 tax deed" because the 1994 tax deed cited the same erroneous statute. The record lacks evidence, however, that Hamilton changed his position in reliance on any specific representation by the County. Since estoppel is an affirmative defense, Hamilton bore the burden of proving reliance. *See id.* at 969. He failed to meet this burden. Hence, the trial court properly denied Hamilton's equitable estoppel claim.

### C. Validity of Hamilton's Conviction for Criminal Trespass

¶ 36 Finally, Hamilton argues that even if the trial court did not err in submitting the criminal trespass charge to the jury as a question of fact or in denying his equitable estoppel claim, we should overturn his criminal trespass conviction because there was insufficient evidence to support the jury verdict. We disagree.

¶ 37 As discussed in Part II.A.2 above, the State produced six pieces of evidence supporting Ranger Enterprises' ownership of Vance Springs and Hamilton's unlawful presence thereon. Hamilton nevertheless attempts to argue that this evidence was insufficient to support a jury verdict. He asserts that the fact that the 1994 tax deed cited an erroneous statute clouds title to Vance Springs sufficiently to create a reasonable doubt about whether he was unlawfully on the property.

¶ 38 In reviewing a jury verdict, we accord high deference to the fact-finder at trial. "[W]e do not 'weigh conflicting evidence,'" *Julian v. State*, 2002 UT 61, ¶ 16, 52 P.3d 1168 (quoting *State v. Logan*, 563 P.2d 811, 813 (Utah 1977)), nor do we "'substitute [our] judgment for that of the fact-finder,'" *id.* (quoting *State v. Lamm*, 606 P.2d 229, 231 (Utah 1980)). Viewing the evidence in this light, we conclude that there was ample evidence "from which a reasonable jury could find that the elements of [criminal trespass] had been proven beyond a reasonable doubt." *State v. Dibello*, 780 P.2d 1221, 1225 (Utah 1989) (citations omitted); *State v. Clark*, 2001 UT 9, ¶ 13, 20 P.3d 300. We thus affirm Hamilton's conviction for criminal trespass.

## III. ATTEMPTED AGGRAVATED MURDER, AGGRAVATED ASSAULT, KILLING A POLICE SERVICE DOG

¶ 39 At the conclusion of the State's case in chief, Hamilton moved to dismiss the charges of attempted aggravated murder, aggravated assault, and killing a police service dog, claiming that there was insufficient evidence to warrant submitting these charges to the jury. The trial court denied his motion. We affirm.

¶ 40 "A defendant's motion to dismiss for insufficient evidence at the conclusion of the State's case in chief requires the trial court to determine whether the defendant must proceed with the introduction of evidence in his defense." *State v. Noren*, 704 P.2d 568, 570 (Utah 1985) (citing *State v. Smith*, 675 P.2d 521, 524 (Utah 1983)). If the State fails to produce "believable evi-

dence of all the elements of the crime charged," *State v. Clark*, 2001 UT 9, ¶ 13, 20 P.3d 300 (quotations and citations omitted), the trial court must dismiss the charges. Utah Code Ann. § 77–17–3 (1999); Utah R.Crim. P. 17(o).

¶ 41 When evaluating whether the State produced sufficient "believable evidence" to withstand a challenge at the close of the State's case in chief, we apply the same standard used when reviewing a jury verdict. Hence, believable evidence in this context means the evidence must be "capable of supporting a finding of guilt beyond a reasonable doubt." *See Clark*, 2001 UT 9 at ¶ 15, 20 P.3d 300. Stated more fully, "if upon reviewing the evidence and all inferences that can be reasonably drawn from it, the court concludes that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt," *id.* at ¶ 13 (quotations and citations omitted), we will uphold the denial of a motion to dismiss. We therefore turn now to a discussion of the charges of attempted aggravated murder, aggravated assault, and killing a police service dog.

### A. Attempted Aggravated Murder

¶ 42 Hamilton challenges the sufficiency of the evidence regarding the attempted aggravated murder charge. Specifically, he argues that the trial court erred in denying his motion to dismiss because there was insufficient evidence to submit the two statutory aggravators to the jury. The two statutory aggravators at issue require that the victim be a peace officer who was either "acting under color of legal authority" or "on duty." Utah Code Ann. § 76–5–202(1)(e), (k) (1999). To support this contention, Hamilton asserts that Deputy Chambers's conduct fell "wholly outside the scope of his authority" because he used excessive force by firing shots at Hamilton. Hamilton claims this action divested Chambers of his police status as a matter of law. We disagree.

¶ 43 Attempted aggravated murder occurs when a person takes a substantial step toward "intentionally or knowingly caus[ing] the death of another under any of the" seventeen aggravating circumstances listed in the

statute. *Id.* §§ 76–4–101, 76–5–202(1). At trial, the prosecution asserted two alternative statutory aggravators:

(e) the homicide was committed for the purpose of avoiding or preventing an arrest of the defendant or another by *a peace officer acting under the color of legal authority* or for the purpose of effecting the defendant's or another's escape from lawful custody;

. . . .

(k) the victim is or has been a peace officer [or] law enforcement officer ... and the victim *is either on duty* or the homicide is based on, is caused by, or is related to that official position, and the actor knew, or reasonably should have known, that the victim holds or has held that official position.

*Id.* § 76–5–202(1)(e), (k) (emphasis added).

¶ 44 In this instance, we need not delineate the nuances of any difference in the "acting under the color of legal authority" or "on duty" standards because, under any reasonable articulation of those standards, it is beyond question that Chambers was both "acting under the color of legal authority" and "on duty." Chambers was conducting official police business and in uniform at the time Hamilton shot him. Chambers went to Vance Springs with three other uniformed officers and a police dog in his official capacity to remove trespassers and to arrest any person that resisted. Moreover, there was ample evidence from which a reasonable jury could find that Hamilton shot Chambers while Chambers was trying to arrest him, and that Hamilton did so to avoid arrest. Hence, we conclude that the trial court did not err in denying Hamilton's motion to dismiss because there was sufficient evidence to warrant submitting the attempted aggravated murder charge to the jury.

### B. Aggravated Assault

¶ 45 We now examine Hamilton's claim that there was insufficient evidence to submit the aggravated assault charge to the jury. The State charged Hamilton with aggravated assault because he allegedly aimed his rifle at Sheriff Yardley in a threatening

manner. A person commits aggravated assault if he or she (1) commits assault, and (2) "uses a dangerous weapon ... or other means or force likely to produce death or serious bodily injury." Utah Code Ann. § 76-5-103(1)(b) (1999). Section 76-5-102(b) defines an assault as "a threat, accompanied by a show of immediate force or violence, to do bodily injury to another." *Id.* § 76-5-102(1)(b). Hamilton advances that the State did not produce sufficient evidence from which a jury could reasonably conclude that his conduct constituted "a threat, accompanied by a show of immediate force or violence," *id.*, and therefore, the trial judge should not have submitted the charge to the jury. Again, we disagree.

¶ 46 Although Hamilton denies that his rifle was aimed at Yardley, all evidentiary inferences must be viewed in the "light most favorable to the [jury] verdict." *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116. In this case, Yardley testified that Hamilton's rifle was aimed directly at him when Hamilton warned him not to come any closer. Yardley further testified that even after Hamilton swung his rifle away from him, he still kept it in firing position, with both hands near the trigger. Additionally, Deputy White witnessed the encounter between Yardley and Hamilton and corroborated Yardley's testimony. Based on this evidence, a reasonable jury could find that Hamilton's actions constituted "a threat, accompanied by a show of immediate force or violence, to do bodily injury to another." *Id.* We conclude therefore that the aggravated assault charge was properly submitted to the jury.

### C. Killing a Service Dog

¶ 47 Hamilton contends that the trial court erred in denying his motion to dismiss the charge of killing a police service dog because Max had lost his status as a police service animal at the time he was killed. In his view, Max lost his status as a police service animal because his handler, Deputy Chambers, "was not acting within his authority as a peace officer" when Max was shot.

¶ 48 Section 76-9-306 of the Utah Code makes it a class A misdemeanor for a person to intentionally "cause bodily injury or death to a police service animal." Utah Code Ann. § 76-9-306(2) (1999).[13] A "police service animal" is defined as "any dog or horse used by a law enforcement agency, which is specially trained for law enforcement work, or any animal contracted to assist a law enforcement agency in the performance of law enforcement duties." *Id.* § 76-9-306(1)(b).

¶ 49 Hamilton urges this court to read into the service animal statute a specific limitation on police dog status: that a dog's police service status is contingent upon its handler's continuing status as a police officer. In other words, if a police handler acts outside the scope of his authority, his police dog also loses its status as a police service animal. We find Hamilton's reasoning problematic in light of the plain language of the statute.[14] However, we decline to decide whether a police service animal loses its status when its handler acts outside the scope of his authority because, as we have already held, there was sufficient evidence from which a reasonable jury could conclude that Chambers was both "acting under the color of legal authority" and "on duty" during the events at Vance Springs.

¶ 50 Moreover, defense counsel conceded in oral argument that Chambers acted within the scope of his police authority at least until Chambers fired shots at Hamilton. Since the evidence shows that Chambers did not fire shots at Hamilton until after Hamilton shot Max, by the defense's own admission, Chambers was acting within the scope of his police authority at the time Max was shot. Therefore, Max could not have lost his police service status at the time he was shot. We thus conclude that the trial court did not err in denying Hamilton's motion to dismiss the charge of killing a police service dog and that

---

13. The statute was amended, effective May 1, 2000, so that it is now a third degree felony to intentionally injure or kill a police service animal. Utah Code Ann. § 76-9-306(2) (Supp. 2001). However, we cite the statute in effect at the time the crime occurred.

14. When our review "requires us to examine statutory language, we look first to the plain meaning of the statute." *Young v. Salt Lake City Sch. Dist.*, 2002 UT 64, ¶ 10, 52 P.3d 1230.

it was proper to submit this charge to the jury.

## IV. INTERFERENCE WITH AN ARRESTING OFFICER

■■ ¶ 51 Hamilton also challenges his conviction for interference with an arresting officer. Section 76–8–305 of the Utah Code provides that a person is guilty of a misdemeanor if he or she has "knowledge, or by the exercise of reasonable care should have knowledge, that a peace officer is seeking to effect a lawful arrest or detention ... and [that person] interferes with the arrest or detention by ... use of force or any weapon." Utah Code Ann. § 76–8–305 (1999). While Hamilton's brief on this issue is not a model of clarity, he apparently contends that Deputy Chambers was "acting wholly outside the scope of his authority" while he was at Vance Springs and that Chambers was not there for purposes of arresting him. Thus, Hamilton could not have interfered with an arresting officer. Because we have concluded in Part II.B., *supra*, ¶ 44, that there was ample evidence that (1) Hamilton shot Chambers while Chambers was on duty, and (2) Hamilton did so while trying to avoid arrest, Hamilton's contention that he did not interfere with an arresting officer necessarily fails. Thus, we uphold the jury's verdict on this charge.

## V. SELF–DEFENSE JURY INSTRUCTION

■■ ¶ 52 Hamilton raises an additional claim with regard to the attempted aggravated murder charge. He argues that the trial court erred by giving a jury instruction that effectively limited the jury's opportunity to consider justification or self-defense. Because Hamilton approved the instruction before it was given to the jury, we find no error.

¶ 53 Rule 19(e) of the Utah Rules of Criminal Procedure provides that "[u]nless a party objects to an instruction or the failure to give an instruction, the instruction may not be assigned as error except to avoid a manifest injustice." Utah R.Crim. P. 19(e). Since Hamilton's "failure to object to the instruction presents a barrier to our consideration" under the general rule of 19(e), *State v. Medina*, 738 P.2d 1021, 1023 (Utah 1987), he seeks review under the manifest injustice exception.

■■ ¶ 54 To review an instruction under the manifest injustice exception, counsel must have *failed* to object to the instruction. *Id.* In the past, we have reviewed an instruction under the manifest injustice exception only where, instead of objecting, counsel "merely remained silent at trial." *Id.* However, if counsel, either by statement or act, affirmatively represented to the court that he or she had no objection to the jury instruction, we will not review the instruction under the manifest injustice exception. *Id.; State v. Anderson*, 929 P.2d 1107, 1109 (Utah 1996). This prevents a party from " 'tak[ing] advantage of an error committed at trial when that party led the trial court into committing the error.' " *Anderson*, 929 P.2d at 1109 (quoting *State v. Dunn*, 850 P.2d 1201, 1220 (Utah 1993)). We adhere to this rule for two important reasons. " 'First, it fortifies our long-established policy that the trial court should have the first opportunity to address the claim of error. Second, it discourages parties from intentionally misleading the trial court so as to preserve a hidden ground for reversal on appeal.' " *Id.* (quoting *Dunn*, 850 P.2d at 1220).

¶ 55 In this case, the trial court instructed the jury that, "if a peace officer is seeking to effectuate an arrest, a person may not 're-sist' unless the officer is acting wholly outside the scope of his authority." Hamilton contends that this instruction was prejudicial because it did not explain to the jury that self-defense is allowable when a peace officer acts outside the scope of his authority. The evidence shows, however, that before the trial court instructed the jury on the law, defense counsel had approved the now disputed language. The trial court specifically required "counsel to confirm on the record, that the State takes no exception to the instructions ... nor does the Defense." Both the prosecutor and defense counsel did so by affirmatively indicating that they had no objections to the instructions. Hence, the manifest injustice exception does not apply to this case. We hold that there was no

error in submitting the instruction to the jury.

## VI. THE CUMULATIVE ERROR DOCTRINE

¶ 56 Lastly, Hamilton argues that even if no single error merits reversal, the cumulative effect of the trial court's errors prejudiced his right to a fair trial. The cumulative error doctrine requires reversal "only if 'the cumulative effect of . . . several errors undermines our confidence . . . that a fair trial was had.' " *State v. Dunn,* 850 P.2d 1201, 1229 (Utah 1993) (citations omitted). Here, Hamilton's argument is unavailing because the trial court committed no error. We thus uphold Hamilton's convictions.

## CONCLUSION

¶ 57 Regarding Hamilton's criminal trespass arguments, first, the trial court properly submitted the charge to the jury as a question of fact. Hamilton was not entitled to a dismissal of the charge as a matter of law based on the 1994 tax deed because his challenge to the tax deed constituted an impermissible collateral attack on prior judgments. Additionally, the trial court properly denied Hamilton's equitable estoppel claim because he did not prove that he relied on any specific representation made by the County with respect to the tax sales or deed. Finally, Hamilton's alternative argument that there was insufficient evidence to sustain his conviction for criminal trespass fails because the State presented sufficient evidence from which a reasonable jury could find him guilty beyond a reasonable doubt.

¶ 58 Second, the trial court properly denied Hamilton's motion to dismiss the charges of attempted aggravated murder, aggravated assault, and killing a police service dog because the State presented sufficient evidence from which a reasonable jury could conclude that Hamilton was guilty beyond a reasonable doubt. Moreover, Hamilton's claim that he did not interfere with an arresting officer necessarily fails because the evidence shows that he shot Deputy Chambers while resisting arrest.

¶ 59 Third, Rule 19(e) of the Utah Rules of Criminal Procedure prevents Hamilton from claiming prejudicial error from a jury instruction that he approved before the trial court instructed the jury.

¶ 60 Finally, Hamilton's cumulative error argument necessarily fails because the trial court committed no error in its proceedings. We thus affirm each of Hamilton's convictions.

¶ 61 Chief Justice DURHAM, Justice RUSSON, Justice WILKINS, and Judge BENCH concur in Associate Chief Justice DURRANT'S opinion.

¶ 62 Justice Howe does not participate herein; Court of Appeals Judge Russell W. Bench sat.