2011 UT App 96

STATE of Utah, Plaintiff and Appellee,

v.

Anthony WATKINS, Defendant and Appellant.

No. 20090866–CA.

Court of Appeals of Utah.

March 24, 2011.

Michael K. Mohrman, John A. Quinn, and Mitchell S. Maio, Salt Lake City, for Appellant.

Mark L. Shurtleff and Jeanne B. Inouye, Salt Lake City, for Appellee.

Before Judges DAVIS, ROTH, and BENCH.[1]

## OPINION

DAVIS, Presiding Judge:

¶ 1 Anthony Watkins appeals his conviction for aggravated sexual abuse of a child, a first degree felony, *see* Utah Code Ann. § 76–5–404.1(5) (2008). We affirm.

## BACKGROUND

¶ 2 In September 2008, Watkins accepted a job with his niece's husband (Father). Watkins temporarily moved in with his niece (Stepmother) and Father until he could afford to get a place of his own. Three of Father and Stepmother's children lived with them during the time Watkins stayed at their home. Additionally, Father's ten-year-old child from a previous relationship (Child) visited Father and Stepmother "regularly" while Watkins was living with them.[2]

¶ 3 Three years prior, Watkins had lost his son and stepdaughter in a tragic accident. Following the accident, his marriage suffered and he and his wife were eventually divorced.

---

1. The Honorable Russell W. Bench, Senior Judge, sat by special assignment pursuant to Utah Code section 78A–3–103(2) (2008) and rule 11–201(6) of the Utah Supreme Court Rules of Professional Practice.

2. Child did not have a consistent schedule for visiting Father, so the precise amount of time she spent with him while Watkins lived in the home is unclear. However, Child's mother testified that Child spent half of the first two weeks in October at Father's home; Child testified that she visited Father "[a]bout a week" every month and that she went for "[a] couple" visits while Watkins was living with Father; Stepmother testified that Child visited once or twice each week; and Father testified, "[Child] would come for a couple of days, leave for a couple of days. Sometimes she would stay for a week, sometimes longer."

On approximately October 15, 2008, Watkins's ex-wife remarried. That same day, Child stayed at Father's home overnight. Upset about his ex-wife's remarriage, Watkins drank a significant amount of alcohol that night. Child and the other three children were all sleeping in her room after watching a movie. After Child had fallen asleep, she woke up to find Watkins in bed with her kissing her on the side of her head. She asked him to stop and to leave, but then he began "pinching" or "rubbing" her buttocks with his hand. Child also testified at trial and in her interview at the Children's Justice Center that Watkins "spanked [her] butt." Watkins finally left after Child told him to leave a second time, but he then returned and gave her a $100 bill, telling her not to tell anyone about the money.

¶ 4 Following the incident, Child no longer wanted to visit Father's home while Watkins was there. After a couple of weeks, Stepmother asked Child why she did not want to visit anymore and Child finally told her that it was because Watkins had "tried to kiss her on the head." Subsequently, Child disclosed the details of the incident to her mother, Stepmother, and Father. Father reported the incident to police, and Watkins was arrested.

¶ 5 Watkins was charged with aggravated sexual abuse of a child, a first degree felony, see id. The aggravating circumstance alleged by the State is that Watkins was in a position of special trust with respect to Child, see id. § 76–5–404.1(4)(h). At trial, after the State rested its case, Watkins moved to dismiss, arguing that the State had failed to prove that he was in a position of special trust with respect to Child and that he had acted with the "intent to arouse or gratify the sexual desire of any person," see id. § 76–5–404.1(2). The trial court denied the motion to dismiss, concluding that "the position of trust was simply indicated by a mature adult and a 10–year–old child who had lived in the same home" and that the issue of intent was one that "the jury ought to hear." [3] The jury convicted Watkins.

¶ 6 Prior to sentencing, Watkins moved for the trial court to arrest judgment and grant a new trial based on the affidavit of Stepmother's sister (Sister), which recounted the following conversation she had with Stepmother via text message a few days after trial:

> [Stepmother:] "I could really use someone to talk to right now. I'm in a really big bind I just need someone an[d] I thought maybe you could talk sometime."
>
> … [Sister:] "If [you] would [have] told the judge the whole story like [Watkins] spanking the kids and [Child's little brother] was crying and no one was taking time [for] him. [Watkins] wouldn[']t be in this situation. Not everything was told in court."
>
> … [Stepmother:] "The kids said that they got spanked and … [Child's little brother] fell off the bed and was crying."

Watkins argued that because Stepmother testified at trial that Child had not told her she had been spanked, the conversation demonstrates that Stepmother lied in her testimony at trial, that a truthful answer would have corroborated his version of events, and that he was, therefore, entitled to a new trial. The trial court denied Watkins's motion and sentenced him to a term of ten years to life in prison, one of the minimum mandatory sentences for aggravated sexual abuse of a child, see Utah Code Ann. § 76–5–404.1(6) (2008).

## ISSUES AND STANDARDS OF REVIEW

¶ 7 Watkins argues that the trial court erred by denying his motion to dismiss. "The denial of a motion to dismiss for failure to establish a prima facie case is a question of law[, which] we review for correctness." State v. Spainhower, 1999 UT App 280, ¶ 4, 988 P.2d 452. In evaluating the correctness of the trial court's ruling, "we apply the same standard used when reviewing a jury verdict." State v. Hamilton, 2003 UT 22, ¶ 41, 70 P.3d 111. A motion to dismiss is properly denied where "the evidence and all inferences that can be reasonably drawn from it

---

3. Due to a recording malfunction, the last part of the State's case-in-chief, the motion to dismiss, and the defense's case were not recorded. However, the attorneys and the trial court later summarized, on the record, the arguments and ruling with respect to the motion to dismiss.

[establish that] some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Spainhower*, 1999 UT App 280, ¶ 5, 988 P.2d 452 (alteration in original) (internal quotation marks omitted); *accord Hamilton*, 2003 UT 22, ¶ 41, 70 P.3d 111.

¶ 8 Watkins also argues that the trial court should have granted his motion for a new trial based on Stepmother's text messages. "When reviewing a trial court's denial of a motion for a new trial, we will not reverse absent a clear abuse of discretion by the trial court." *State v. Pinder*, 2005 UT 15, ¶ 20, 114 P.3d 551 (internal quotation marks omitted). "However, we review the legal standards applied by the trial court in denying such a motion for correctness ... [and] the trial court's factual findings for clear error." *Id.* (citation and internal quotation marks omitted).

## ANALYSIS

### I.  Motion to Dismiss

¶ 9 Watkins argues that there was insufficient evidence from which a reasonable jury could find, beyond a reasonable doubt, that he was in a position of special trust with respect to Child or that he acted with the intent to gratify a sexual desire. We disagree. First, there was sufficient evidence presented from which a jury could find that Watkins was in a position of special trust with respect to Child by virtue of his status as a cohabitant of Father. Second, the evidence of Watkins's actions toward Child is sufficient for the jury to infer intent because there is not such a reasonable alternative explanation for his behavior that a jury must necessarily have had a reasonable doubt as to Watkins's intent.

---

4.  These include "a youth leader or recreational leader who is an adult, adult athletic manager, adult coach, teacher, counselor, religious leader, doctor, employer, foster parent, baby-sitter, adult scout leader, natural parent, stepparent, adoptive parent, legal guardian, grandparent, aunt, uncle, or adult cohabitant of a parent." Utah Code Ann. § 76–5–404.1(4)(h) (2008).

5.  The parties also dispute whether, alternatively, Watkins was in a position of special trust by

### A.  Position of Special Trust

■    ¶ 10 Sexual abuse of a child, which is normally a second degree felony, *see* Utah Code Ann. § 76–5–404.1(3), is a first degree felony where any one of several enumerated aggravating circumstances exists, *see id.* § 76–5–404.1(4)–(5). In this case, the State argued that aggravating circumstances existed because Watkins "occupied a position of special trust in relation to [Child]," *see id.* § 76–5–404.1(4)(h).

¶ 11 The fact that Watkins occupied a position of special trust may be established in two ways:

> either by occupying a position specifically listed by statute [4] or by fitting the definition of a position of special trust, which the statute clearly defines as a "position occupied by a person in a position of authority, who, by reason of that position is able to exercise undue influence over the victim."

*State v. Tanner*, 2009 UT App 326, ¶ 16, 221 P.3d 901 (quoting Utah Code Ann. § 76–5–404.1(4)(h) (2008)); *see also State v. Rowley*, 2008 UT App 233, ¶ 10, 189 P.3d 109. The State argues that there was sufficient evidence to show that Watkins was an "adult cohabitant of [Child]'s parent," one of the positions of special trust specifically identified in the statute, *see* Utah Code Ann. § 76–5–404.1(4)(h). Watkins argues for a narrower definition of cohabitant than the one advanced by the State and argues that the trial court should have granted his motion to dismiss because there was no evidence from which a reasonable jury could have found that he was a cohabitant of Father.[5]

¶ 12 " '[T]he term "cohabitation" does not lend itself to a universal definition that is applicable in all settings.' Thus, 'the meaning of [cohabitation] depends upon the con-

---

virtue of the fact that he occupied a position of authority by which he was able to exercise undue influence over Child. *See generally State v. Tanner*, 2009 UT App 326, ¶ 16, 221 P.3d 901 (listing the two alternative means of establishing a position of special trust); *State v. Rowley*, 2008 UT App 233, ¶ 10, 189 P.3d 109 (same). However, because we conclude that Watkins was a cohabitant of Father, we do not reach this alternative argument.

text in which it is used.'" *Keene v. Bonser,* 2005 UT App 37, ¶ 7, 107 P.3d 693 (second alteration in original) (quoting *Haddow v. Haddow,* 707 P.2d 669, 671 (Utah 1985)). The jury instructions employed the definition of cohabitant found in the Cohabitant Abuse Act, informing the jury that Watkins was a cohabitant of Father if either he was "related by blood or marriage to [Father]" or he "resides or has resided in the same residence as [Father]." [6] *See* Utah Code Ann. § 78B–7–102(2) (2008). However, that definition is limited to the provisions of the Cohabitant Abuse Act and is not necessarily applicable in other contexts. *See Hill v. Hill,* 968 P.2d 866, 868–69 (Utah Ct.App.1998) (holding that the Cohabitant Abuse Act's definition of cohabitant did not abrogate the definition of cohabitant developed by case law in the context of alimony termination).

¶ 13 The definition found in the Cohabitant Abuse Act is significantly broader than the common definition of the word "cohabitant," *see generally Keene,* 2005 UT App 37, ¶ 10, 107 P.3d 693 ("In construing the plain language of a statute, words which are used in common, daily, nontechnical speech, should, in the absence of evidence of a contrary intent, be given the meaning which they have for laymen in such daily usage." (internal quotation marks omitted)), which may mean either "to live together as or as if husband and wife" or "to live together or in company," *see Webster's New Collegiate Dictionary* 257 (9th ed. 1986); *see also Black's Law Dictionary* 296 (9th ed. 2009) (defining the term "cohabitation" as "[t]he fact or state of living together, esp[ecially] as partners in life, usu[ally] with the suggestion of sexual relations"). The inclusion of individuals who do not necessarily live together, such as anyone "related by blood or marriage," *see* Utah Code Ann. § 78B–7–102(2)(c), in the Cohabitant Abuse Act's definition of cohabitant is inconsistent with the plain meaning of the word. Thus, where the legislature has not

specifically ascribed that definition to the term "cohabitant" as used in the context of defining a position of special trust, we do not presume that it intended to do so. *Cf. Lowry v. G & L Enters.,* 2011 UT App 94, ¶ 12 (holding that a broad statutory definition of a term that was inconsistent with the term's plain meaning did not affect the term's definition in other contexts). This is particularly true given that such an expansive definition of the term in the context of this statute would render redundant the inclusion of many of the individuals specifically listed, such as grandparents, aunts, and uncles, *see* Utah Code Ann. § 76–5–404.1(4)(h). *See generally State v. Bluff,* 2002 UT 66, ¶ 35, 52 P.3d 1210 (rejecting an interpretation of a statute that "would render portions of the statute redundant, superfluous, and inoperable").

¶ 14 However, the portion of the Cohabitant Abuse Act defining cohabitants as those who "reside[ ] or ha[ve] resided in the same residence," Utah Code Ann. § 78B–7–102(2)(f), is a reasonable definition in the position of special trust context because it is consistent with the plain meaning of cohabitant. Before applying this definition, however, it is necessary to determine what is meant by the word "reside." Like the term "cohabitant," the term "resident" "has no precise, technical, and fixed definition applicable in all contexts and to all cases." *Government Emps. Ins. Co. v. Dennis,* 645 P.2d 672, 674 (Utah 1982). *Compare, e.g.,* Utah Code Ann. § 53–3–102(30) (2010) (defining the term "resident" for purposes of the Uniform Driver License Act), *with* Utah Code Ann. § 32A–1–105(51)–(52) (Supp.2010) (defining the terms "residence" and "resident" for purposes of the Alcoholic Beverage Control Act).

¶ 15 Watkins argues that residence implies permanency and is synonymous with domicile. *See generally Webster's New Collegiate*

---

6. The State argues that Watkins waived any objection to this definition by assenting to the jury instructions. However, because Watkins is challenging only the trial court's ruling on the motion to dismiss, it is the definition employed by the trial court in making that ruling that is at issue, not the ultimate jury instruction, which was assented to only after the motion to dismiss

was denied. *Cf. State v. Kihlstrom,* 1999 UT App 289, ¶ 9, 988 P.2d 949 (stating that where the "[d]efendant's appeal focuses on the denial of the motion to dismiss at the close of the State's case-in-chief," the appellate court's "review of the sufficiency of the evidence is limited to the evidence adduced by the prosecution in its case-in-chief").

*Dictionary* 1003 (defining the term "reside" as "to dwell permanently or continuously: occupy a place as one's legal domicile"). *But see generally id.* (defining the term "residence" as "the place where one actually lives as distinguished from his domicile or a place of temporary sojourn"). Watkins argues that he was only living with Father temporarily and therefore cannot be deemed to have resided in the same home as Father. We have previously rejected such a "narrow, legalistic interpretation" of the definition of reside as it relates to the definition of cohabitant. *See Keene,* 2005 UT App 37, ¶ 9, 107 P.3d 693 (rejecting argument that the defendant could not be a cohabitant of his girlfriend because he did not have legal residence in Utah sufficient to obtain a fishing or driver license, to be sued in the county based on his residency, or to register to vote). *See generally Lilly v. Lilly,* 2011 UT App 53, ¶ 13, 676 Utah Adv. Rep. 17 ("[I]n exploring the meaning of the terms 'resident' and 'reside,' it is important to recognize that a distinction of legal significance exists between the concepts of physical residence and legal residence or domicile."); *Black's Law Dictionary* 1424 (defining the term "resident" simply as "[a] person who lives in a particular place" or "who has a home in a particular place" and clarifying that "a resident is not necessarily either a citizen or a domiciliary"); *id.* at 1423 (defining the term "residence" as "[t]he place where one actually lives, as distinguished from a domicile," and explaining that "[r]esidence usu[ally] just means bodily presence as an inhabitant in a given place" (emphasis omitted)).

■ ¶ 16 Although a person may live somewhere temporarily, if he dwells there continuously and he treats the place as his home, he may be considered a resident of the place for purposes of determining whether he is a cohabitant of other individuals living there. *See Keene,* 2005 UT App 37, ¶¶ 12–13, 107 P.3d 693 (stating that a residence may be either "temporary or permanent" and listing several "nonexclusive factors" that may indicate cohabitation). In this case, the evidence indicated that Watkins lived with Father full-time, had his own room, and paid rent. This was sufficient evidence that he was a resident of the home and, therefore, a cohabitant of Father.[7] *Cf. id.* ¶ 13 (stating that the amount of time a person spends at the home, as opposed to other residences; whether the person treats the place as his home; and whether he shares financial obligations to maintain the household are some of the variety of factors that may indicate that the person is a resident of a home).

## B. Intent

■ ¶ 17 There was likewise sufficient evidence of Watkins's intent for the issue to be submitted to the jury. "[I]ntent is a state of mind generally to be inferred from the person's conduct viewed in light of all the accompanying circumstances." *State v. Kihlstrom,* 1999 UT App 289, ¶ 10, 988 P.2d 949. Like the question of whether Watkins was in a position of special trust, the question of Watkins's intent was properly submitted to the jury so long as there was "some evidence, including reasonable inferences," *see State v. Hall,* 946 P.2d 712, 724 (Utah Ct.App.1997), from which the jury could find, beyond a reasonable doubt, that Watkins intended "to arouse or gratify the sexual desire of any person," *see* Utah Code Ann. § 76–5–404.1(2) (2008).

---

7. Watkins also argues that we should interpret the language of Utah Code section 76–5–404.1(4)(h) to place only an adult cohabitant of a *custodial* parent within the definition of a position of special trust, asserting that a cohabitant of a noncustodial parent should not presumptively hold a position of special trust because a child is unlikely to see them "regularly." However, there is nothing in the plain language of the statute to suggest that such a limited interpretation was intended by the legislature. *See generally State v. Carreno,* 2006 UT 59, ¶ 11, 144 P.3d 1152 ("[Legislative] intent is most readily ascertainable by looking to the plain language of the statute."). To the contrary, regularity of contact appears to be irrelevant to this analysis, as the statute lists several individuals as being in a position of special trust whose relationship to the child may be even more remote than a cohabitant of a noncustodial parent, such as aunts and uncles, who may have infrequent contact with their nieces and nephews, and babysitters, who may come into contact with their charges only a single time. *See* Utah Code Ann. § 76–5–404.1(4)(h); *see also Rowley,* 2008 UT App 233, ¶ 13, 189 P.3d 109 (holding that the position of special trust is not dependent on the closeness of the defendant's relationship with the child).

¶ 18 There appears to have been no legitimate reason for Watkins to be in Child's room at the time of the incident.[8] The evidence indicated that Watkins kissed Child wetly on the side of her head for approximately three minutes and that he pinched and rubbed her buttocks for approximately two minutes. It was reasonable for the jury to infer from these facts that Watkins intended to arouse or gratify his sexual desire, and there is not an alternative explanation for Watkins's actions such that "reasonable minds must have entertained a reasonable doubt" as to Watkins's intent. *See Hall*, 946 P.2d at 724 (internal quotation marks omitted) (holding that the jury could infer intent from the fact that the defendant pulled down the victim's shorts and stroked her genitals); *see also State v. Tueller*, 2001 UT App 317, ¶¶ 2, 20, 37 P.3d 1180 (stating that the court could "think of no conceivable explanation" for the defendant being on top of the child victim on the bathroom floor with both of their pants pulled down "other than to arouse or gratify the sexual desire of any person" (internal quotation marks omitted)). The fact that Watkins gave Child a $100 bill immediately following the incident could also be construed by the jury as evidence that Watkins knew he had done something wrong and was trying to make up for it.

## II. Motion for a New Trial

¶ 19 Watkins next argues that the trial court erred in refusing to grant him a new trial based on the text messages between Stepmother and Sister. It is appropriate for a trial court to grant a motion for a new trial based on newly discovered evidence if the evidence (1) "could not with reasonable diligence have been discovered and produced at the trial," (2) is not "merely cumulative," and (3) "render[s] a different result probable on the retrial of the case." *State v. Montoya*, 2004 UT 5, ¶ 11, 84 P.3d 1183 (internal quotation marks omitted). Watkins argues that the messages support his assertion that he did not go into Child's room intending "to gratify a desire to kiss [her] on the head and to touch her backside over her pajama bottoms." Watkins asserts that "[t]hroughout

the trial . . . [he] maintained that he entered the room because [Child's little brother] had been crying and that he, in his drunken state, had spanked the children for allowing [Child's little brother] to disturb him." Because the text messages indicate that the children told Stepmother that Watkins had spanked them, whereas Stepmother testified at trial that Child had not told her that Watkins spanked her, Watkins argues that he should be able to present them in support of his intent argument at a new trial. Watkins's argument fails, however, because the text messages do not support any theory of intent actually raised at trial, the text messages are not contrary to Stepmother's testimony, the text messages are cumulative of other evidence presented at trial, and Watkins's intent in entering the room is not determinative of his intent in kissing and touching Child.

¶ 20 First, contrary to Watkins's assertion, he never argued at trial that he entered Child's room to scold the children for disturbing him. In fact, Watkins's counsel attempted to persuade the jury, during closing arguments, of a contrary motivation, suggesting that Watkins entered the room because he "was in need of human contact, people to be with," as a result of his despair over the loss of his children and his ex-wife's remarriage. Additionally, Child's testimony that all of the children were asleep when Watkins came in and that her little brother only woke up after Watkins entered the room undermines Watkins's most recent version of events and makes the likelihood of a different result on retrial dubious.

¶ 21 Second, the text messages do not prove that Stepmother lied in her testimony. Stepmother never claimed that Watkins had not spanked the children; she only testified that Child had not told her she had been spanked by Watkins. Her text message does not directly contradict this testimony because it states only that "[t]he kids" told her they had been spanked, not that Child specifically told her that Watkins had spanked her.

---

**8.** Although Watkins now argues that he entered the room to scold the children for keeping him

awake, that theory was not argued at trial. *See infra* ¶ 20.

¶ 22 Third, the text messages are cumulative of other evidence already presented at trial indicating that Watkins spanked the children when he came into the room. Child herself stated that Watkins had "spanked [her] butt," and both Stepmother and the investigating officer testified that Watkins had told them that he had "hit[ ]" or "spanked" the kids. Watkins could have used this evidence to attempt to persuade the jury at trial of the motive he now advances—that he entered the room to quiet the children—but he chose not to.

¶ 23 Finally, the reason Watkins initially entered the room is not determinative of the question of whether he had the intent to arouse or gratify a sexual desire when he actually kissed Child and rubbed her buttocks, as that intent could have been formed after he entered the room and began touching Child. *Cf. State v. Rudolph*, 970 P.2d 1221, 1229 (Utah 1998) (holding that "the intent to commit a felony, theft, or assault" in the context of a burglary may be formed either at the time of unlawful entry "or at any time thereafter while [the defendant] continues to remain there unlawfully"). For all of these reasons, there is virtually no likelihood that a different outcome would result if Watkins were permitted to provide evidence of the text messages at a new trial.

## CONCLUSION

¶ 24 The trial court did not err by denying Watkins's motion to dismiss because there was sufficient evidence from which the jury could have found both that he was in a position of special trust with respect to Child and that he had the requisite intent to arouse or gratify his sexual desires. Furthermore, the trial court did not err in denying Watkins's motion for a new trial because the text messages between Stepmother and Sister did not support any theory advanced by the defense at trial, did not demonstrate that Stepmother had lied in her testimony, were cumulative of evidence already presented at trial, and were not probative of sexual intent. We therefore affirm.

¶ 25 WE CONCUR: STEPHEN L. ROTH, Judge and RUSSELL W. BENCH, Senior Judge.

