ROYAL STREET LAND COMPANY, a Utah corporation, Plaintiff and Appellant,

v.

William J. REED, Patsy Reed, and First Security Bank of Utah, N.A., Defendants and Respondents.

No. 19480.

Supreme Court of Utah.

July 9, 1987.

---

3. *See generally Cady v. Johnson,* 671 P.2d 149 (Utah 1983).

4. *Id.*

5. Utah R.Civ.P. 52(a); *Ashton v. Ashton,* 733 P.2d 147, 149-50 (Utah 1987).

Samuel O. Gaufin, Gregory K. Orme, M. Scott Woodland, Salt Lake City, for plaintiff and appellant.

Joseph Novak, Stephen L. Roth, Rodney R. Parker, Salt Lake City, for defendants and respondents.

HOWE, Justice:

Plaintiff appeals from a summary judgment granted to defendants in this action to quiet title to real property in Park City.

In 1928–29, William Lawrey, a shift boss for Park Utah Consolidated Mines Company, fenced off about two-thirds of an acre of the Trump, Goodell, and Olive Branch millsites and built a house and double garage. He also improved the property by erecting fences and planting a garden and shrubs. Lawrey occupied the property until September 9, 1946, when he conveyed "House No. 570 with double garage, on South side of Deer Valley, Marsack millsite" to Ray L. Pederson by quitclaim deed.

In 1954, Ray Pederson died. His widow, Edith Pederson, continued to live in the house and surrounding yard. On June 15, 1955, in an effort to establish herself as owner of that property, she paid Summit County $116.77 for delinquent taxes for the years 1950–53. Summit County conveyed its interest in the property to her by quitclaim deed, describing the property as the "9th house rear South side of Deer Valley, Park City, Utah."

On November 2, 1956, to further establish her rights in the "land and premises" upon which she resided, she filed a "Declaration of Homestead" in the Summit County recorder's office. She continued in possession until she conveyed by quitclaim deed to defendants William and Patsy Reed on August 13, 1962. The deed was properly recorded and conveyed "House No. 570, with double garage, being the ninth (9th) house on the rear, South side of Deer Valley, Park City, Utah, including all land surrounding the house between the lateral fence lines and extending from the road in front to the road in rear."

On August 9, 1973, defendants executed a quitclaim deed to themselves as joint tenants with full rights of survivorship. This "new" deed included a metes-and-bounds description, as well as the general property description contained in the Pederson deed referred to above. Defendants have lived in the house themselves or have had tenants in possession continuously since 1962. They also made approximately $20,000 worth of improvements to the house and real property.

Defendants paid all taxes on "9th House S. Side Deer Valley P.C. House # 570 with double garage" as assessed by Summit County upon the buildings between the years 1962–73. No assessment of the surface of the land was made by the county. In 1973, the tax notices were changed to include the metes-and-bounds description contained in the "new" deed. In addition, for the first time, the surface and buildings were both assessed, each separately. The total property valuation was $785, allocated $200 to "real property" and $585 for the buildings. Defendants paid all taxes assessed and levied in this manner through 1979, when this action was commenced.

On October 11, 1975, United Park City Mining Company (United Park), which had acquired title to the Trump, Goodell, and Olive Branch millsites through mesne conveyances from Park Utah Consolidated Mines Company, sold forty acres thereof containing the disputed property to Greater Park City Mine Company. The millsites were then patented mining claims. United Park executed a special warranty deed reserving the mineral rights and excepting the rights of all parties in possession, specifically excepting the effect of the quitclaim deed defendants had executed to themselves in 1973 and a mortgage defendants had given to defendant First Security Bank (which has since been satisfied and discharged). Three days later, on October 14, 1975, Greater Park City Mine Company conveyed the forty acres to the plaintiff, Royal Street Mining Company. Conveyance was made by a special warranty deed

containing the same reservation and exceptions as in the deed that United Park had executed to Greater Park City Mine Company three days earlier. From 1939 to the commencement of this suit in 1979, United Park and its predecessors in interest paid all taxes assessed on the Trump, Goodell, and Olive Branch millsites assessed by the Utah Tax Commission pursuant to authority vested in it by Utah Code Ann. § 59–5–57 (1974) to assess metalliferous mines and mining claims.

Plaintiff brought this action to quiet title on October 23, 1979, just eight days before defendants paid for the seventh consecutive year the taxes assessed on both the land and the buildings. Defendants answered plaintiff's complaint, seeking to have title quieted in them. Both parties moved for summary judgment. The trial court granted defendants' motion and denied plaintiff's motion. Title to the surface[1] and improvements was quieted in defendants.

Conditions under which title to real property may be acquired by adverse possession are found in Utah Code Ann. § 78–12–12 (1987). This section provides that to obtain title by adverse possession, the claimant must be in actual, open, notorious, and exclusive possession of the property for seven years continuously, during which time the claimant or his predecessors must pay "all taxes which have been levied and assessed upon such land according to law." See Central Pacific Railway Co. v. Tarpey, 51 Utah 107, 168 P. 554 (1917); Home Owners' Loan Corp. v. Dudley, 105 Utah 208, 141 P.2d 160 (1943).

■ The record indicates that on November 2, 1956, Edith Pederson executed and recorded a "Declaration of Homestead" "to further establish [her] rights to the house and [her] rights to the property surrounding the house between the north and south roads and the east and west fences." Once the "Declaration of Homestead" was properly filed and recorded, there was no doubt as to her intent to claim title to the property described. From November 2, 1956, she remained in actual, open, and exclusive possession for five years, nine months, and thirteen days. When she conveyed the property to defendants on August 13, 1962, they moved into privity of possession with her. Thus, by tacking Mrs. Pederson's period of possession with just a few years of defendants' successive period of possession, the statutory requirement of seven years of continuous, actual, open, and exclusive possession of the property was satisfied. See generally Home Owners' v. Dudley, supra.

Plaintiff contends, however, that during those seven years, defendants failed to fulfill the additional statutory requirement of paying all taxes "which have been levied and assessed upon such land." § 78–12–12. Plaintiff argues (1) that defendants and their predecessors paid taxes prior to 1973 only on the buildings and improvements and not on the surface estate, and (2) that beginning in 1973 defendants paid taxes on the surface estate but did so for only six years prior to the institution of the instant action by plaintiff on October 23, 1979.

We recently held in Park West Village, Inc. v. Avise, 714 P.2d 1137 (Utah 1986), that an adverse possessor meets the requirements of section 78–12–12 to pay all taxes which have been levied and assessed if he pays all taxes levied and assessed on the improvements when no taxes are levied and assessed on the surface of the land. That case, like the instant case, involved the adverse possession of a lot in Park City where the Summit County assessor had also assessed only the improvements and had not assessed the surface. The failure of the assessor to assess the surface did not defeat the claim of the adverse possessor because he had in fact "paid all taxes levied and assessed on such land." There is a difference, however, in the two cases in that in the instant case, plaintiff and its predecessors in interest have paid since 1939 the taxes levied on the Trump, Goodell, and Olive Branch millsites based on an

1. The mineral rights are still held by United Park City Mining Company.

assessment of $5 per acre[2] made by the Utah Tax Commission pursuant to section 59–5–57, which provides:

> All metalliferous mines and mining claims, both placer and rock in place, shall be assessed at $5.00 per acre.... All machinery used in mining and all property or surface improvements upon or appurtenant to mines or mining claims and the value of any surface use made of mining claims or mining property for other than mining purposes shall be assessed at thirty percent of their reasonable fair cash value. In all cases where the surface of lands is owned by one person and the mineral underlying such lands is owned by another, such property rights shall be separately assessed to the respective owners. In such cases the value of the surface if it is used for other than mining purposes shall be assessed by the assessor of the county in which the property is situated.

Plaintiff contends that the payment by its predecessors of taxes levied on the $5–per–acre assessment from 1939 to 1979 was in fact payment on both the surface and the underlying minerals. Hence, it argues that defendants did not pay all taxes assessed and levied on the disputed property. Plaintiff misreads section 59–5–57. The second sentence of the above-quoted material is clear that "the value of any surface use made of mining claims or mining property for other than mining purposes shall be assessed at thirty percent of their reasonable fair cash value." This assessment is in addition to the assessment of $5 per acre. *Telonis v. Staley*, 104 Utah 537, 144 P.2d 513 (1943). This statutory directive is in implementation of article XIII, section 4 of the Constitution of Utah, which provides in part: "[A]nd the value of any surface use made of mining claims or mining property for other than mining purposes, shall be assessed as other tangible property." Thus it is clear that the additional assessment of the value of the surface use is required whether the surface is owned by the same owner of the underlying minerals or not. The next to the last sentence of section 59–5–57, which deals with cases where the surface and the underlying minerals are owned by separate owners, does not imply otherwise. It simply provides that in such cases, each owner shall be separately assessed the value of his respective property interests. But in all cases, the nonmining surface use, if any, and the underlying minerals must be assessed and taxed.

Thus the payment of taxes made by plaintiff's predecessors on the millsites does not defeat defendants' claim of adverse possession. Since no taxes were levied and assessed on the surface use, defendants were not required to pay them. This result is in accord with our recent decision in *United Park City Mines Co. v. Clegg*, 737 P.2d 173 (Utah 1987). There, we reaffirmed our holding in *Utah Copper Co. v. Eckman*, 47 Utah 165, 152 P. 178 (1915), and in *Utah Copper Co. v. Chandler*, 45 Utah 85, 142 P. 1119 (1914), that a surface user can adversely possess the surface estate even when the owner of a mining claim has paid the taxes assessed on the claim pursuant to section 59–5–57, if the surface user pays all taxes which are lawfully assessed for his or her surface use unrelated to mining. In *Clegg*, however, the adverse possessor failed to perfect his claim for adverse possession because he had not given the county assessor any notice of his occupancy, such as the placing of improvements on the property unrelated to mining purposes as in *Eckman* and *Chandler* or by requesting the county to assess the value of the surface which the possessor used for sheep grazing and recreational activities. That problem does not exist in the instant case where the possession of defendants and their predecessors was evident by the structures they erected on the property and where the evidence indicates that as early as 1950, Summit County began assessing and taxing those improvements.

The summary judgment in favor of defendants is affirmed.

---

**2.** Section 59–5–57 was amended to increase the assessment to $10 per acre in 1981, and in 1985 the section was again amended and the assessment raised to $50 per acre.

HALL, C.J., STEWART, A.C.J., and DURHAM and ZIMMERMAN, JJ., concur.