2008 UT 22

**David H. ALLRED, deceased, by and through Mary A. JENSEN, personal representative for the Estate of David H. Allred; and Inez H. Allred, Plaintiffs, Appellants, and Cross–Appellees,**

v.

**Richard G. ALLRED, individually and as Trustee for The Richard Mark Allred Trust, The Robert Matthew Allred Trust, The Mary Michelle Allred Trust, The Michael Christopher Allred Trust, The Stephen James Allred Trust, The Karen Allred Trust, The Nathan Allred Trust, The Mary Allred Trust; Mary Lee Allred, as Trustee for the Richard G. Allred Trust; and Qwest Corporation, Defendants, Appellees, and Cross–Appellants.**

Nos. 20051049, 20060171.

Supreme Court of Utah.

March 4, 2008.

Rehearing Denied April 17, 2008.

Michael R. Carlston, Kenneth L. Reich, Salt Lake City, for plaintiffs.

Richard G. Allred, Anaheim, CA, for defendants.

Mary Lee Allred, Bountiful, pro se.

DURRANT, Justice:

## INTRODUCTION

¶ 1 In this case we are called upon to decide whether a claimant to property by adverse possession may satisfy the actual possession requirement through a tenant. We conclude that placing a tenant on property and collecting the rent for one's own benefit may constitute actual possession and use of the property adverse to the legal title holder, which, if hostile, open and notorious, and continuous for the statutory period, may ripen into legal title. Accordingly, we reverse the district court's order granting summary judgment to the legal title holder in this case. Further, we reverse the district court's order denying summary judgment for the claimants in this case and remand with instructions to enter summary judgment in their favor and for other proceedings consistent with this opinion.

## BACKGROUND

¶ 2 The material facts presented in this appeal are not in dispute. Plaintiffs David and Inez Allred (the "Parents") acquired commercial property in Provo, Utah, (the "Property") in approximately 1972 and leased the Property shortly thereafter to Mountain States Telephone & Telegraph Company, a predecessor of Qwest Communications. Qwest Communications or its predecessors (collectively, "Qwest") have remained in possession of the Property as tenants from 1974 to the present.

¶ 3 In 1982, the Parents' son Richard, an attorney, prepared nine trust documents on behalf of the Parents for the benefit of himself, his brother Stephen, and their spouses and children. The documents named Richard as trustee of eight of the trusts and Richard's wife, Mary Lee Allred, as trustee of the trust for the benefit of Richard. In December 1982, the Parents signed the trust

documents along with a quitclaim deed conveying a fifty-percent interest in the Property to the nine trusts. In early 1983, the Parents signed another quitclaim deed conveying the remaining fifty-percent interest to the nine trusts.

¶ 4 Despite the conveyance to the trusts, the Parents continued to act as landlords of the Property. They collected rent from Qwest and reported it as income on their tax returns, which were sometimes prepared by Richard. They made alterations and repairs on the Property at Qwest's request. They personally negotiated and signed lease modifications and renewals with Qwest in 1987, 1994, and 1999, always designating themselves as "owner" in the lease agreements. They paid taxes on the Property and, in accordance with the terms of the leases, received reimbursements from Qwest. In the 1987 lease modification, they arranged for Qwest to pay the taxes directly.

¶ 5 In 1991, the Parents decided to donate the Property to their church. They contacted Richard and asked him to convey the Property back to them. Richard refused. Over the next several years, the Parents repeatedly made requests for the return of the property both in person and through a series of letters to Richard. In one letter, they set a deadline by which, if the Property had not been returned, they would "have to proceed with such action as [they] deem necessary."

¶ 6 Although Richard steadfastly refused to reconvey the Property, he did not take any action to prevent the Parents from managing the Property and receiving the rent until 2000–nine years after the Parents first requested that the Property be returned. In 2000, Richard contacted Qwest and executed a new lease agreement that directed Qwest to pay rent to the trusts. The new lease agreement purported to incorporate and ratify the conditions and terms of all previous lease agreements executed by the Parents.

¶ 7 In February 2001, the Parents filed suit against the nine trusts, Richard Allred individually and as trustee, and Mary Lee Allred as trustee (collectively, the "Trusts"), alleging causes of action for fraud, breach of fiduciary duty, and adverse possession. The

Trusts' Answer included assertions that the claims for fraud and breach of fiduciary duty were barred by the statutes of limitations. The Trusts counterclaimed for an accounting and return of trust funds received as rent.

¶ 8 The Parents and Qwest moved to interplead the rent from the Property. Although the district court had not yet ruled on the Parents' adverse possession claim, it denied the motion to interplead the rent, holding as follows:

> [T]he documents provided by Richard Allred demonstrate that the property leased by QWEST is owned by the trusts, David and Inez Allred having conveyed it to the trusts in 1982. Though plaintiffs assert that they have a colorable claim to the lease rents, I don't see it. Rather, on the face of the documents provided by the parties, the property is owned by the trusts and the lease rents should be paid to the trusts.

Thereafter, Qwest paid rent to the Trusts.

¶ 9 The parties filed cross-motions for summary judgment on the issue of adverse possession. The Trusts argued that, as a matter of law, the Parents could not adversely possess the Property through a tenant. Furthermore, they argued that any actions by the Parents in administering the Property as landlord were taken on behalf of and with the permission of the Trusts. The district court denied both motions for summary judgment on the adverse possession issue, citing unresolved issues of material fact.

¶ 10 The Trusts filed a motion for summary judgment on the issues of fraud and breach of fiduciary duty, claiming the causes of action were barred by the applicable statutes of limitations. In their reply, the Parents argued that Richard Allred's relationship to the Parents as son and occasional tax preparer tolled the statutes of limitations. The district court granted summary judgment for the Trusts on the Parents' claims for fraud and breach of fiduciary duty, holding that the claims were barred by the statutes of limitations. The district court found that, at the very latest, the Parents were aware of their cause of action in 1993 when

they wrote the letters demanding that Richard return the Property.

¶ 11 Before a scheduled trial on the Parents' adverse possession claim and the Trusts' accounting counterclaim, the Trusts filed a motion in limine seeking to exclude any evidence that the Parents had obtained title by adverse possession through their tenant. The Trusts argued that the Parents never had actual possession of the property and cited *Pender v. Jackson*[1] for the proposition that a lease is not a "use" of the property by which a claimant can satisfy the requirement of actual possession. The district court granted the Trusts' motion in limine, excluding any evidence of the Parents' adverse possession through a tenant. Because the Parents' claim for adverse possession relied solely on the theory that they had used the Property as landlord, the order effectively granted summary judgment to the Trusts on the adverse possession claim.

¶ 12 Thus, the only remaining claim was the Trusts' accounting counterclaim for the rent paid by Qwest to the Parents. The district court ruled that the statute of limitations for the accounting claim limited the reach-back period of the accounting claim to three years and awarded the Trusts $127,800, the gross rents for that period. Before any order was entered, Judge Schofield replaced Judge Stott, who had to that point presided over the litigation. The Parents filed a motion to alter or amend Judge Stott's ruling. Following a one-day bench trial on the issue of offsets, Judge Schofield concluded that the parents had valid claims of waiver and estoppel that had not previously been considered. In Judge Schofield's view, Richard had waived his right to claim rents for the Trusts by preparing and filing the Parents' tax returns for tax years 1994, 1995, 1996, and 1997. The Trusts were therefore awarded nothing.

¶ 13 After Judge Stott awarded back rent to the Trusts but before Judge Schofield took over the case, the Trusts recorded a notice of lis pendens on the Parents' residence, a property unrelated to the Property occupied by Qwest. After the notice was recorded, Judge Schofield advised the parties that he would reconsider the accounting award. The Parents then moved for the removal of the lis pendens as an unauthorized cloud on the title. Judge Schofield ordered the Trusts to remove the notice of lis pendens and awarded the Parents $8,511.60 in fees and costs under the lis pendens statute.

¶ 14 In this appeal, the Parents assert that the district court (1) erred by ruling that the Parents could not present evidence of adverse possession through a tenant, (2) erred by not granting summary judgment in their favor on the adverse possession claim, and (3) erred by ruling that the Trusts' claims for fraud and breach of fiduciary duty were barred by the statutes of limitations. The Trusts, on cross-appeal, assert that Judge Schofield erred by improperly reconsidering and reversing Judge Stott's award on the accounting claim and in awarding fees and costs in the matter of the lis pendens. We have jurisdiction pursuant to Utah Code section 78-2-2(3)(j).

## STANDARD OF REVIEW

¶ 15 Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[2] The court must view all facts and inferences in the light most favorable to the nonmoving party, but it may not assume facts for which no evidence is offered.[3] We review a trial court's order granting summary judgment for correctness.[4]

## ANALYSIS

¶ 16 We will first address the Parents' claim to the Property by adverse possession through their tenant, Qwest. Second, we will discuss the Parents' argument that their

1. 123 Utah 501, 260 P.2d 542 (1953).

2. Utah R. Civ. P. 56(c).

3. *See Peterson v. Coca–Cola USA*, 2002 UT 42, ¶ 20, 48 P.3d 941.

4. *See Krantz v. Holt*, 819 P.2d 352, 353 (Utah 1991).

causes of action for fraud and breach of fiduciary duty are not barred by the statutes of limitations. Finally, we will discuss the Trusts' cross-appeals on the accounting award and the award of fees and costs related to the filing of the lis pendens.

## I. ADVERSE POSSESSION

¶ 17 The Parents argue that even if the 1982 and 1983 deeds effectively conveyed the Property to the Trusts, the Parents regained title to the Property through adverse possession. In *Royal Street Land Co. v. Reed,* we explained that one who claims property by adverse possession must show that his use and possession of the property has been actual, open and notorious, and continuous for the statutory period.[5] A claimant must also have paid all taxes levied on the property during the statutory period.[6]

### A. A Claimant May Satisfy the Actual Possession Requirement Through a Tenant

¶ 18 The Parents claim that their possession of the Property was adverse to the legal title holder because the Property was continuously occupied by Qwest, a tenant in subordination to the Parents, not the Trusts. The Trusts argue that the Parents cannot satisfy the actual possession requirement because they never occupied the Property personally. The Trusts cited *Pender v. Jackson*[7] for the proposition that a lease is not a "use" of the property by which a claimant can satisfy the actual possession requirement.[8] The district court agreed and ruled that the Parents could not introduce evidence of adverse possession through their tenant.

¶ 19 We disagree with the district court's interpretation of *Pender* and hold that a claimant may satisfy the actual possession requirement by leasing property to a tenant. Notably, *Pender* was not a case

involving a landlord and tenant. Instead, the claimant in *Pender* was a land speculator who purchased tax deeds and never occupied or made any use of the land, either personally or through a tenant.[9] In *Pender*, we disagreed with the claimant's contention that "'holding the land for investment, speculation, lease, or the like'" fulfills the actual possession and occupation requirement of adverse possession codified in Utah Code section 78–12–9.[10] We noted that "[m]erely holding the land for speculation is the *purpose* for which the land is held and not the *use* of the land."[11] We denied the "adverse claim because the necessary element of possession or occupation, as defined by the Utah statute, [was] not established."[12]

¶ 20 Unlike the claimant in *Pender*, the Parents did not merely hold the land for speculation in anticipation of a lease or a future sale. Instead, the Parents made actual use of the Property by signing rental agreements with the tenant, collecting and using the rental income, making repairs, and improving the Property.

¶ 21 "Actual possession" is a flexible term, and the use of property necessary to establish it will vary with the character of the property. This concept is certainly not novel or exclusive to Utah law:

[P]ossession of land is the holding of, and exclusive exercise of, dominion over it. It is evident that this is not and cannot be uniform in every case, and that there may be degrees in the exclusiveness even of the exercise of ownership. The owner cannot occupy literally the whole tract—he cannot have an actual *pedis possessio* of all, nor hold it in the grasp of his hands. His possession must be indicated by other acts. The usual one is that of inclosure. But this cannot always be done, yet he may hold the possession in fact of uninclosed

---

5. 739 P.2d 1104, 1106 (Utah 1987); *see also* Utah Code Ann. § 78–12–7 (2002).

6. *Reed,* 739 P.2d at 1106; *see also* Utah Code Ann. § 78–12–12.

7. 123 Utah 501, 260 P.2d 542 (1953).

8. *Id.* at 543.

9. *Id.*

10. *Id.* (internal quotation marks omitted).

11. *Id.*

12. *Id.*

land by the exercise of such acts of ownership over it as are necessary to enjoy the ordinary use of which it is capable, and acquire the profits it yields in its present condition. Such acts, being continued and uninterrupted, will amount to actual possession; and, if under color of title or chain of right, will be adverse.[13]

For example, a claimant to a rock quarry may satisfy the actual possession requirement by entering the land to quarry and remove rock; the claimant need not be domiciled on the quarry.[14] In the case of a rental property like that in dispute in this case, it would be incongruous to hold that a claimant must necessarily occupy the property personally, particularly when the utility and value in a rental property is in collecting rent from tenants.

¶ 22 We have only infrequently addressed the issue of adverse possession through a tenant. In each case, however, we assumed without discussion that a claimant could satisfy the actual possession requirement through a tenant and, if all other requirements were met, claim legal title to the property by adverse possession.[15] In the context of an unlawful detainer action to recover a possessory right in federally owned school land, we held that "[a]fter the land has thus been subjected to the will and dominion of the claimant, there seems to be no sound reason why such claimant may not keep control through an agent or tenant."[16] In another early case, we held, without discussion, that the claimants' possession of several lots "in person and by their tenants" constituted "open, notorious, and exclusive adverse possession."[17] The lack of discussion on the point may well be because no party in the cases advanced the contention that actual possession could not be met by renting the property to a tenant. Furthermore, our research reveals no case in which we denied a claimant's adverse possession claim because the claimant possessed the land through a tenant.

 ¶ 23 In addition to our caselaw, Utah statutory law provides that "the possession of the tenant is the possession of the landlord."[18] While the most obvious purpose of the statute is to shield landlords from adverse possession claims by their tenants, its plain language supports our conclusion that whoever is acting as landlord to the tenant is in actual possession of the property for the purpose of an adverse possession claim. Thus, we agree with the Parents that a claimant may satisfy the actual possession requirement of an adverse possession claim by placing a tenant on the land and collecting the rent for the claimant's own benefit.

 ¶ 24 A claimant who places a tenant on the land must still meet all other requirements of adverse possession. Renting the property to a tenant and collecting the rent for the claimant's own use is not hostile to the legal title owner when it is done in subordination to the legal title owner.[19] Thus, a sublease or any lease recognizing the legal title owner will not meet the hostility requirement. In addition, the claimant must pay all taxes levied on the land, and his

---

**13.** *Colvin v. McCune,* 39 Iowa 502, 506–07 (1874) (internal quotation marks and citation omitted); *see also* 3 Am.Jur.2d *Adverse Possession* § 24 (2000) ("The requirement of actual possession may be met or kept fresh through possession, on behalf of the adverse claimant, by a tenant of the claimant.").

**14.** *Colvin,* 39 Iowa at 505–06; 3 Am.Jur.2d *Adverse Possession* § 75.

**15.** *Park West Vill., Inc. v. Avise,* 714 P.2d 1137, 1139 (Utah 1986) (stating that claimant "entered into possession ... and continuously occupied the same, either personally or through her tenants"); *Michael v. Salt Lake Inv. Co.,* 9 Utah 2d 370, 345 P.2d 200, 201 (1959) (upholding claimants' adverse possession claim where claimants' "representatives, tenants and successors" occupied the property and paid taxes for the statutory period); *e.g., Bozievich v. Slechta,* 109 Utah 373, 166 P.2d 239, 241 (1946) (stating that claimant "intended to assert and did assert ownership to the property by placing its tenants in possession, and did not recognize any right of redemption in the original owner").

**16.** *Hyndman v. Stowe,* 9 Utah 23, 33 P. 227, 229 (1893).

**17.** *Dignan v. Nelson,* 26 Utah 186, 72 P. 936, 938 (1903).

**18.** Utah Code Ann. § 78–12–14.

**19.** *See People v. Lapcheske,* 73 Cal.App.4th 571, 86 Cal.Rptr.2d 565, 569 (1999).

possession must be continuous for the statutory period.[20]

¶ 25 In this case, the district court ruled that the Parents could not, as a matter of law, introduce evidence of actual possession through their tenant, Qwest. Because we hold that a claimant may satisfy the actual possession requirement through a tenant, we reverse.

## B. The Parents Are Entitled to Summary Judgment on Their Adverse Possession Claim

▆▆ ¶ 26 Prior to the district court's determination that the Parents could not present evidence of adverse possession through their tenant, the district court denied the Parents' motion for summary judgment on the issue of adverse possession, citing unresolved issues of fact. The Parents challenge this ruling on appeal. In light of our holding that a claimant may satisfy the actual possession requirement of adverse possession through a tenant, we reverse the district court's ruling and hold that the undisputed facts show that the Parents possessed the Property adverse to the Trusts for the statutory period.

▆▆ ¶ 27 Following the 1982 and 1983 deed conveyances, the Parents continued to act as landlord to Qwest by collecting rent, managing the Property, negotiating lease agreements, and making repairs. The possession was open and notorious, putting the Trusts on notice that the Parents were acting as the landlord of the property. Richard was put on notice because he prepared the tax returns for the Parents on which they reported the rental income from the Property. Acting as landlord and collecting the rent for personal use is, as discussed above, actual possession of the land. Furthermore, such actions are prima facie hostile to the claim of the legal title owner unless done in subordination to the legal title owner.[21]

¶ 28 Here, the Trusts argue that the Parents' management of the Property was in subordination to the Trusts. At various times during the litigation, the Trusts attempted to present testimonial evidence of a secret agency arrangement between David and Richard whereby the Parents would continue to enjoy the profits from the Property during their lifetime despite legal ownership by the Trusts. Whether such an arrangement existed and whether that arrangement negated the hostile character of the possession would, under most circumstances, be factual issues for trial.

¶ 29 Regardless of whether there was such an arrangement at one time, however, the dispute between the parties that arose in 1991 when the Parents attempted to donate the Property to their church is inconsistent with the secret agency arrangement continuing beyond that date. The Parents made an unequivocal claim of ownership and continued for an additional nine years as landlords of the Property until 2000, when Richard contacted Qwest and executed a new lease agreement. Any permissive arrangement that might have existed prior to the 1991 dispute could not have endured beyond that date. Despite the Parents' apparent exercise of dominion over the Property, the Trusts did not bring a cause of action during the seven-year statutory period. Even if we assume, as the Trusts suggest, that a secret agency relationship existed beginning in 1982, the Parents have nevertheless met the requirement of actual possession of the property that was hostile to the legal title holder and continuous for the statutory period.

¶ 30 Finally, the Parents were required to pay taxes on the land throughout the statutory period.[22] It is undisputed that the Parents paid the taxes until 1987. In 1987, 1994, and 1999, the Parents entered into lease agreements directing Qwest to pay the taxes directly. Just as the Parents may satisfy the actual possession requirement through the possession of their tenant, so too they may satisfy the requirement to pay taxes by directing their tenant to pay the taxes as part of the lease agreement. In this case, the Parents, not the Trusts, entered into the lease agreements directing that Qwest pay

**20.** Utah Code Ann. § 78–12–12.

**21.** *Lapcheske,* 86 Cal.Rptr.2d at 569.

**22.** Utah Code Ann. § 78–12–12.

the property taxes. Thus the Parents have satisfied the requirement to pay taxes on the Property.

¶ 31 Even with all inferences drawn in favor of the Trusts, the Parents are nevertheless entitled to judgment as a matter of law on their adverse possession claim. Therefore, we reverse the decision of the district court and remand with instructions to enter summary judgment in favor of the Parents on their adverse possession claim quieting title to the Property in them and for further proceedings consistent with this opinion.

## II. STATUTES OF LIMITATIONS

¶ 32 The Parents challenge the district court's ruling on summary judgment that their causes of action for fraud and breach of fiduciary duty against Richard are barred by the applicable statutes of limitations. The Parents argue that the statutes of limitations were tolled through 1999 because Richard continued to act as a fiduciary to the Parents until he redirected the rent. The district court found that the Parents were aware of the conveyance and any cause of action related to it no later than 1993, when the Parents wrote a letter to Richard demanding the return of the Property. We find no error in the district court's analysis and affirm.

¶ 33 The Parents' fraud and breach of fiduciary duty claims relate to the 1982 and 1983 deed conveyances. They claim that Richard, acting as attorney and advisor to his parents, deceived them into signing the deeds conveying the Property to the Trusts. The alleged fraudulent activities occurred nineteen years before the 2001 lawsuit was filed. Nevertheless, the Parents argue that the discovery rule prevents their causes of action from being barred by the applicable statutes of limitations. "The discovery rule can toll the statute of limitations when there is (1) a statutory tolling provision, (2) an exceptional

circumstance, or (3) fraudulent concealment." [23] We address each of these bases for tolling in turn.

### A. Statutory Tolling Provision

¶ 34 While the statute of limitations for fraud found in Utah Code section 78–12–26(3) contains a statutory tolling provision, the statute of limitations for breach of fiduciary duty found in Utah Code section 78–12–25(3) does not.[24] Utah Code section 78–12–26(3) requires that a cause of action for fraud must be brought within three years, "except that the cause of action in such case does not accrue until the discovery by the aggrieved party of the facts constituting the fraud." [25] We explained the application of the statutory discovery rule for fraud claims in *Russell Packard Development, Inc. v. Carson:*

[W]hen a plaintiff first has actual or constructive knowledge of the relevant facts forming the basis of the cause of action—the statutory limitations period begins to run and a plaintiff who desires to file a claim must do so within the time specified in the statute. Otherwise, the claim will be barred.[26]

¶ 35 Considering that the Parents continued to exercise control as owners of the Property following the conveyance, it is certainly plausible that they did not discover the facts forming the basis of their fraud claim immediately after the 1982 and 1983 conveyances. However, the Parents were aware of those facts by 1991 when they asked Richard to return the Property so that they could donate it. If not then, they were indisputably aware by the time they wrote a letter to Richard dated January 15, 1993, demanding that Richard sign deeds conveying the Property back to the Parents by February 15 of that year and stating: "Richard, whatever your decision on February 15th, let's have it, either give us your signature as we have asked on the enclosed form, or go about your

---

**23.** *Colosimo v. Roman Catholic Bishop of Salt Lake City,* 2007 UT 25, ¶ 11, 156 P.3d 806.

**24.** *Compare* Utah Code Ann. § 78–12–26(3), *with* Utah Code Ann. § 78–12–25(3); *see also Kamas Sec. Co. v. Taylor,* 119 Utah 241, 226 P.2d 111, 118 (1950) (holding that the statute of limitations governing claims for breach of fiduciary duty

was the predecessor to Utah Code section 78–12–25(3)).

**25.** Utah Code Ann. § 78–12–26(3).

**26.** 2005 UT 14, ¶ 22, 108 P.3d 741.

way of ignoring us. We will then know how to proceed in either event of your choice." The Parents did not file an action until eight years later in 2001. The statutory discovery provision does not toll the statute of limitations in this case because the Parents were aware of the facts constituting the alleged fraud.

### B. Exceptional Circumstance

¶ 36 The Parents next argue that the applicable statutes of limitations for both fraud and breach of fiduciary duty were subject to tolling under the exceptional circumstances doctrine. "Under this doctrine, the limitations period is tolled 'where the case presents exceptional circumstances and the application of the general rule would be irrational or unjust, regardless of any showing that the defendant ... prevented the discovery of the cause of action.' " [27] In light of the Parents' threat to pursue and apparent ability to pursue a cause of action in a timely manner and Richard's steadfast refusal to return the Property, we cannot say that the parties were in grossly unequal positions or that the application of the statutes of limitations to this case would be irrational or unjust. Moreover, "[f]or this exception to apply, 'an initial showing must be made that the plaintiff did not know and could not reasonably have discovered the facts underlying the cause of action in time to commence an action within [the limitations period].' " [28] Once again, in light of the fact that the Parents were indisputably aware of the facts underlying their cause of action, the discovery rule does not apply in this case.

### C. Fraudulent Concealment

¶ 37 Finally, the Parents argue that the statutes of limitations for fraud and breach of fiduciary duty were tolled by the fraudulent concealment doctrine because Richard continued to act as a fiduciary, allegedly misleading them into believing that he would work with them in resolving the dispute. But while the Parents allege fraud, they fail to allege concealment. It would be circular to toll the statute of limitations for fraud or breach of fiduciary duty merely because the defendant commits fraud or breaches a fiduciary duty without some further showing that the defendant also concealed it from the plaintiff. By their own admission in their letters, the Parents were aware of the facts forming the basis of their causes of action. Furthermore, the possibility that the parties might have worked out another solution outside of court or that Richard allegedly cajoled them into not filing a lawsuit does not preserve the Parents' late-filed claim.

¶ 38 Therefore, we affirm the district court's ruling that the Parents' causes of action for fraud and breach of fiduciary duty are barred by the applicable statutes of limitations.

### III. RECONSIDERATION OF THE ACCOUNTING CLAIM AWARD

¶ 39 The Trusts challenge the district court's reconsideration and ultimate withdrawal of the $127,800 judgment previously awarded to the Trusts on their accounting claim. Judge Stott never entered the award as a final order. Upon reconsideration, Judge Schofield, who replaced Judge Stott, ruled against the Trusts on the claim. The Trusts assert that reconsideration was procedurally improper and substantively incorrect. The accounting claim was premised, however, on the district court's determination that the Trusts owned the Property. In light of our conclusion that the Trusts do not own the Property, we need not reach the question of whether Judge Schofield properly reconsidered the award. The Trusts are not entitled to any of the rental income. We affirm the district court's ruling that the Trusts are not entitled to an award on their accounting claim.

### IV. AWARD OF ATTORNEY FEES AND COSTS UNDER THE LIS PENDENS STATUTE

¶ 40 The district court, on summary judgment, ordered removal of the notice of

---

27. *Colosimo,* 2007 UT 25, ¶ 19, 156 P.3d 806 (quoting *Russell Packard Dev., Inc.,* 2005 UT 14, ¶ 25, 108 P.3d 741).

28. *Id.* (quoting *Burkholz v. Joyce,* 972 P.2d 1235, 1237 (Utah 1998) (alteration in original)).

lis pendens from the Parents' residence and awarded fees and costs to the Parents. We find no error in the district court's analysis and affirm the award and order to remove the lis pendens.

¶ 41 Utah Code section 78–40–2 authorizes a party to record a lis pendens or notice of an action pending "[i]n any action affecting the title to, or the right of possession of, real property."[29] Section 78–40–2.5 provides property owners or parties to the action with a procedure with which to secure a release of the lis pendens under certain circumstances.[30] In such an action, section 78–40–2.5 requires that the "court shall order a [lis pendens] released if . . . the court finds that the claimant has not established by a preponderance of the evidence the probable validity of the real property claim that is the subject of the [lis pendens]."[31] Furthermore, the statute provides for the award of attorney fees and costs to the prevailing party unless "the nonprevailing party acted with substantial justification; or . . . other circumstances make the imposition of attorney fees and costs unjust."[32]

¶ 42 In this case, the Trusts never alleged any claim affecting title to or possession of the Parents' residence. Furthermore, at the time of the hearing on the action to remove the lis pendens, the Trusts did not have a judgment related to either the residence or the Property, Judge Schofield having advised the parties that he would reconsider the accounting award before entering a final order. The district court correctly held that the Trusts proceeded without substantial justification to litigate their right to leave a notice on the title of the Parents' residential property. We affirm the district court's grant of summary judgment in favor of the Parents for fees and costs related to removing the lis pendens from the Parents' residential property.

## CONCLUSION

¶ 43 We reverse the district court's order excluding evidence of the Parents' claim of adverse possession through their tenant. In addition, we reverse the district court's denial of summary judgment to the Parents on their adverse possession claim and remand with instructions for the district court to enter summary judgment in the Parents' favor and for such other proceedings as are consistent with this opinion. We affirm the district court's ruling that the Parents' claims for fraud and breach of fiduciary duty are barred by the statutes of limitations. And as the Trusts do not own the Property and are not entitled to the rental income, we affirm the district court's withdrawal of the accounting award. Finally, we affirm the district court's award of costs and fees to the Parents for prevailing in their action to remove the notice of lis pendens.

¶ 44 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.

---

**29.** Utah Code Ann. § 78–40–2 (2002).

**30.** Utah Code § 78–40–2.5 (Supp.2007); *Eldridge v. Farnsworth*, 2007 UT App 243, ¶ 42, 166 P.3d 639.

**31.** Utah Code Ann. § 78–40–2.5(3).

**32.** *Id.* § 78–40–2.5(7).