**2025 UT App 168**

## THE UTAH COURT OF APPEALS

CUTTING EDGE REAL ESTATE HOLDINGS, LLC, ET AL.,[1]
Appellees,
*v.*
GENE J. RUSSELL,
Appellant.

Opinion
No. 20240133-CA
Filed November 20, 2025

Third District Court, Tooele Department
The Honorable Teresa L. Welch
No. 130300758

Steven M. Rogers and Alexis A. Hooley,
Attorneys for Appellant

Jeremy C. Reutzel and J. Jacob Gorringe,
Attorneys for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1     This appeal is the latest chapter in a dispute over fifteen parcels of land in Tooele County (collectively, the Properties) that has been litigated, in various forms, for over fifty years. In the case at issue, the district court held a bench trial regarding various claims to the Properties that were made by Gene Russell.[2] After

---

1. Additional Appellees include Valley View Properties, LLC; Eagle Ridge Real Estate, LLC; Golden Spike Real Estate, LLC; Randy Hunt; Nadine Hunt; and Max Hunt.

2. As will be explained below, the four persons principally involved in this case are Mervin Russell, Ada Russell, Gene

(continued…)

the close of trial, the court issued a written ruling rejecting Gene's claims and quieting title in favor of various individuals and entities associated with Cutting Edge Real Estate Holdings, LLC (collectively, Cutting Edge). The court gave several alternative rationales for ruling in Cutting Edge's favor. For the reasons set forth below, we affirm the court's ruling quieting title on the basis of adverse possession. Because this issue is dispositive, we do not consider Gene's challenges to the other rationales provided by the court.

BACKGROUND

*The Russell Divorce and the 1975 Judgment*

¶2 In 1971, Ada and Mervin Russell, who were Gene's parents, divorced. Based on documents recorded in the Tooele County Recorder's Office, title to the Properties was, at the time of the divorce, held as follows:

- Mervin individually owned thirteen parcels;[3]

- Mervin and Ada owned two parcels as cotenants—these were the parcels commonly referred to in the various proceedings as the 14 and 26 Parcels.

---

Russell, and Georgia Monroe. Because Mervin, Ada, and Gene all share the same surname, we'll follow our usual practice and refer to them by their first names, with no disrespect intended by the apparent informality. For consistency of usage, we'll likewise refer to Georgia by her first name after the first reference to her below.

3. These included what the parties have referred to as the Ophir Survey 03 Parcel; the Ophir Survey 04 Parcel; the Ophir Survey Blocks 11, 13, 14, 17, 18, 19, 20, 22, and 23; the Eagle Ridge Parcel; and the Golden Spike Parcel.

Mervin and Ada's divorce decree did not award the Properties to Mervin or Ada, nor did it purport to resolve any issues relating to the Properties' ownership. Soon after Mervin and Ada's divorce, Mervin married Georgia Monroe.

¶3 In 1974, Ada filed a lawsuit against Mervin, claiming that the Properties were assets of the Russell Livestock Company (the Partnership), which was a partnership owned by Ada and Mervin, and Ada further claimed that she still had rights to the Properties through the Partnership. The case was litigated, and in 1975, the court issued a judgment (the 1975 Judgment) that (1) held that the Partnership owned the Properties and (2) ordered the Partnership to sell the Properties and split the proceeds equally between Mervin and Ada. Despite having received this judgment, however, neither Mervin nor Ada ever sold the Properties, either personally or through the Partnership, nor did the Partnership ever purport to convey the Properties to anyone. Of some note, the 1975 Judgment was never renewed.

*Subsequent Conveyances and Lawsuits*

¶4 Although Mervin and Ada never tried to sell the Properties after receiving the 1975 Judgment, they each purported to convey their individual interests in them over the ensuing years. Ada gave deeds to Gene in 1976 and 1980 that, together, conveyed her interest in the majority of the parcels.[4] For his part, when Mervin died in 1985, he left everything, including his real property, to Georgia.

¶5 In 1987, Georgia filed suit against Ada and Gene, seeking to resolve questions over ownership of the Properties. Ada and Gene soon filed their own suit against Georgia, and these cases

---

4. In 2020, Gene, acting as the representative of Ada's estate, conveyed Ada's interest in the remaining parcels to himself through a personal representative's deed.

were then consolidated and litigated together in what we'll refer to as the 1987 Lawsuits.

¶6    Ada died in 1988. That same year, Gene moved out of Tooele County, and he eventually moved permanently to Wyoming. Following Ada's death, Gene was appointed the personal representative of Ada's estate.

¶7    Though records from the 1987 Lawsuits are sparse, it appears that the cases languished for some time without much activity. Two orders were eventually issued in the 1987 Lawsuits that ended up mattering later in separate cases—one of these was issued in 1994 (the 1994 Order), and the other was issued in 2000 (the 2000 Order). The 1994 Order held that "the findings and conclusions in [the 1975 Judgment], if they were ever reduced to judgment, were not the basis of any new proceeding to enforce a judgment based thereon within the period of the eight-year statute of limitations."[5] The 2000 Order reaffirmed this, holding that the 1975 Judgment "became unenforceable eight years after the date it was entered." As a result, the 2000 Order then held that since the 1975 Judgment "had never been applied to the real property, whatever the pre-existing deeds . . . reflected as to

---

5. At the time of the 1994 Order, Utah Code section 78-12-22 (1992) established an eight-year limitations period for actions "upon a judgment or decree of any court of the United States, or of any state or territory within the United States." *See also Mason v. Mason*, 597 P.2d 1322, 1324 (Utah 1979) ("With respect to a judgment, . . . . the owner of the cause of action has already resorted to the court to preserve it; and unless he [or she] can bring another action on the judgment within the eight-year period, he [or she] has no way of preventing the loss of his [or her] justly adjudicated claim." (quotation simplified)); *Fisher v. Bybee*, 2004 UT 92, ¶ 3 n.1, 104 P.3d 1198. This statute has since been amended and renumbered as Utah Code section 78B-2-311, but the relevant language establishing an eight-year statute of limitations remains unchanged. *See* Utah Code § 78B-2-311(1) (2025).

ownership and status of [the Properties] remained . . . effective" as to the "ownership and status" of them.

¶8     Following the 2000 Order, it appears that neither Gene nor Georgia made any meaningful effort to move the 1987 Lawsuits forward, and in February 2007, a judge entered an order directing all exhibits to be destroyed pursuant to the court's retention schedule.[6]

*Cutting Edge Purchases the Properties*

¶9     In 2005, Georgia began selling individual parcels included in the Properties to Cutting Edge (or, as indicated, its affiliated persons or parties). With only one exception, Georgia's deeds purported to convey a 100% interest in the various parcels.[7]

¶10     After acquiring the various parcels from Georgia, Cutting Edge built enclosures around several of them and posted visible "NO TRESPASSING" signs, and it has maintained and reposted these signs over the years. Cutting Edge has paid all applicable taxes on all the parcels it acquired since purchasing them, and it has expended significant time and resources to improve the parcels, including drilling wells, tilling the land, acquiring water rights, leasing various sites to third parties for grazing, and investing heavily in developing and obtaining entitlements. On one parcel (the Eagle Ridge Parcel), Cutting Edge built a large log-cabin-style home and outbuildings, landscaped the surrounding yard, and constructed substantial fencing around the perimeter (complete with multiple locked entry gates).

---

6. Although there appears to be no record of a final judgment that formally closed the 1987 Lawsuits, the district court in the case before us observed that the February 2007 order directing the destruction of all the exhibits was "persuasive evidence that the [1987 Lawsuits] were dismissed, at the latest, in 2007."

7. The exception was the parcel referred to as the Ophir Survey 04 Parcel.

*The Current Lawsuit*

¶11   In 2013, Cutting Edge filed a suit seeking to quiet title in two of the parcels included in the Properties (namely, the 14 and 26 Parcels), as well as in one other parcel connected to the parties that is not at issue in this appeal. As of 2019, that case had not been resolved. In January 2019, Gene filed suit against Cutting Edge, claiming that he held a one-half, undivided interest in all of the parcels included in the Properties, and the Partnership was later added as a party to this case. The two cases were consolidated, and they went to a bench trial in August 2023.

¶12   At trial, Gene advanced a number of theories in support of his claim to co-ownership of the Properties. These included, among others, that (1) "the 1975 Judgment effectively [gave] him ownership rights in the [Properties]," (2) "various oral-agreements made since 1975 [gave] him an ownership interest in the [Properties]," and (3) "various legal theories indicate that [Cutting Edge is] precluded from challenging [Gene's] ownership rights in the [Properties]." Cutting Edge, on the other hand, primarily claimed full ownership of the Properties based on Georgia's deeds, and it alternatively argued that it had acquired the Properties through adverse possession.

¶13   After a five-day bench trial, the district court issued a detailed 73-page ruling. For purposes of this appeal, it's enough to state that the court rejected Gene's various claims and instead quieted title in favor of Cutting Edge, holding that Cutting Edge had proved that its ownership claims to the Properties were "legally valid based on (i) a number of pertinent legally valid deeds and (ii) adverse possession."

¶14   With respect to adverse possession, the court ruled that Cutting Edge had adversely possessed the various parcels because (1) it had paid all taxes and assessments on them for the relevant statutory period and (2) it had openly and notoriously possessed the parcels by posting "NO TRESPASSING" signs on them, improving and maintaining them, living on at least some of them, and routinely visiting and inspecting them. The court then

addressed Gene's assertion that he had rights as a cotenant to the Properties and that, as a result, Cutting Edge was required to show that it had "ousted" him. The court ruled that under the applicable pre-1975 deeds, Gene was a cotenant as to the 14 and 26 Parcels, and for purposes of argument only, it further considered the question of whether Cutting Edge had satisfied this additional burden as to the remaining parcels. In relevant part, the court concluded that Georgia's sales to Cutting Edge effectuated an "ouster," thereby satisfying this requirement.

¶15   Gene now appeals.

ISSUE AND STANDARD OF REVIEW

¶16   Gene challenges several rulings made by the district court, but as we explain below, we conclude that the court's ruling on adverse possession is dispositive. "Whether the trial court applied the proper legal standard" for adverse possession "is a question of law that is reviewed for correctness." *Judd v. Bowen*, 2017 UT App 56, ¶ 12, 397 P.3d 686 (quotation simplified). Because the determination of adverse possession "is fact-intensive, we afford the trial court a broad measure of discretion in its application of the correct legal standard to a particular set of facts and will overturn the determination only if the trial court exceeded its discretion." *Id.* (quotation simplified).

ANALYSIS

¶17   The district court held that Cutting Edge had adversely possessed the Properties under both (A) the general test and (B) the more exacting test that applies in a case involving cotenants. We affirm both aspects of this ruling.

A.   Adverse Possession Generally

¶18   To prevail on an adverse possession claim, the claimant must show (1) "that his [or her] use and possession of the property

has been actual, open and notorious, and continuous for the statutory period" and (2) that he or she has "paid all taxes levied on the property during the statutory period." *Allred ex rel. Jensen v. Allred*, 2008 UT 22, ¶ 17, 182 P.3d 337. The purpose underlying these requirements is to ensure that the party asserting adverse possession is "able to show possession such that the legal titleholder is put on notice of his [or her] claim." *Anderson v. Fautin*, 2016 UT 22, ¶ 25, 379 P.3d 1186 (quotation simplified). In Utah, the statutory period is seven years. *See* Utah Code § 78B-2-214. Further, "under the doctrine of tacking, the seven-year period of possession [and payment of taxes] may be completed by one possessor or by a series of possessors in privity with each other." *Martin v. Kearl*, 917 P.2d 91, 92 n.2 (Utah Ct. App. 1996) (quotation simplified).

¶19   As noted, the district court concluded that Cutting Edge had satisfied these requirements in this case. In challenging that conclusion, Gene first argues that the court "incorrectly analyzed the respective burdens of proof" by placing the burden on him and the Partnership. In Gene's view, "the court's focus should have been solely upon [Cutting Edge's] actions," and "[w]hen the affirmative actions of [Cutting Edge] are considered alone, and not contrasted with the supposed failures" of Gene and the Partnership, "there is a reasonable likelihood that a different outcome would have been reached."[8] We disagree.

¶20   Gene is correct that under Utah law, the burden of proof is placed on the party claiming adverse possession. *See Marchant v. Park City*, 788 P.2d 520, 523–24 (Utah 1990). But in its ruling, the district court expressly acknowledged and then applied this

---

8. Gene also seems to suggest in his briefing that the district court erred by not applying the "clear and convincing evidence" standard to the burden of proof, rather than the "preponderance of the evidence" standard. But Gene has not shown that he preserved this contention below, and in any event, he has inadequately briefed it on appeal. We therefore decline to address it.

standard, and we see no place in the ruling where the court placed the burden of proof on Gene or the Partnership. While the court did, in a few places, comment on the conduct and inaction of Gene and the Partnership with respect to the Properties, the court's ruling was nevertheless replete with references to the "affirmative actions" of Cutting Edge that, in the court's view, demonstrated that Cutting Edge had adversely possessed the Properties through a combination of Georgia's actions and then those of Cutting Edge.

¶21 By way of illustration, the district court found the following facts:

- "In 2005, Georgia began selling individual parcels" to Cutting Edge via personal representative's deeds, "and with only one exception, Georgia's deeds conveyed a 100% interest" in the Properties.

- "Based on [its] communications with Georgia, [Cutting Edge] believed [that] Georgia had resolved all outstanding disputes, if any, over the [Properties'] title, and that Georgia had full right and authority to convey to [Cutting Edge] a 100% interest in the [Properties]."

- "Within a few weeks of acquiring the [Properties] from Georgia, [Cutting Edge] posted visible 'NO TRESPASSING' signs on the [Properties], and [it] has maintained and reposted these signs over the years."

- "Since purchasing the [Properties]," Cutting Edge has "enjoyed exclusive possession and control of" the Properties and has "expended significant time and resources to improve" them.

- "Specifically, [Cutting Edge has] . . . paid all applicable taxes, built enclosures around several parcels, posted 'no trespassing' signs, drilled wells, disked the raw land, acquired water rights, leased various sites to third parties

for grazing, and invested heavily in developing and obtaining entitlements for the Properties."

- "Regarding the improvements to the 'Eagle Ridge Parcel,' [Cutting Edge] built a large log-cabin-style home and outbuildings, landscaped the surrounding yard, and constructed a substantial fencing around the perimeter (complete with multiple locked entry gates)."

¶22 On appeal, Gene has not challenged any of the court's factual findings. Indeed, he explicitly noted in his reply brief that for the sake of this appeal, he "accepts" the court's findings related to adverse possession.

¶23 But accepting the above findings as true, we see no basis for reversing the court's conclusion that Cutting Edge actually, openly, and notoriously possessed the Properties. In past cases, Utah courts have affirmed adverse possession determinations based on facts resembling those at issue here. *See, e.g.*, *Michael v. Salt Lake Inv. Co.*, 345 P.2d 200, 201 (Utah 1959) (holding that the claimants had openly and notoriously possessed property when they erected "no trespassing" signs, used it as a railroad tie yard, and leased it to various tenants who occupied the property in connection with their oil business by erecting buildings, installing other machinery, and parking heavy trucks and trailers); *Mathews v. Baker*, 155 P. 427, 428–29 (Utah 1916) (affirming the district court's determination that a claimant who had made valuable improvements to property by erecting various dwelling places on it, leveling the surface of the ground, building walks, planting shrubbery, and constructing outbuildings "was occupying, holding, and using said premises openly, continuously, publicly, and adversely").

¶24 Moreover, because an adverse possession determination "is fact-intensive, we afford the trial court a broad measure of discretion in its application of the correct legal standard to a particular set of facts and will overturn the determination only if the trial court exceeded its discretion." *Judd v. Bowen*, 2017 UT

App 56, ¶ 12, 397 P.3d 686 (quotation simplified). Here, where Cutting Edge has posted "no trespassing" signs around the various parcels, built enclosures, constructed fencing, and expended significant time and resources to improve the Properties, we see no reversible error in the court's conclusion that Gene was "on notice" that Cutting Edge was claiming the Properties as its own and that the general test for adverse possession was satisfied. *See Anderson*, 2016 UT 22, ¶ 25 (noting that to establish adverse possession "the circumstances must be such that the party who would be losing his [or her] property either had or should have had knowledge that his [or her] property was being claimed by another" (quotation simplified)).[9]

---

9. We note that, by statute, Utah also allows for adverse possession to be established "under written instrument." *See* Utah Code § 78B-2-210 to -211. Adverse possession under written instrument occurs when a "person in possession of the property" (i) "possesses a written document purporting to convey title" and (ii) "has occupied the property continuously for at least seven years." *Id.* § 78B-2-210(1). For purposes of this branch of adverse possession, "the property is considered to have been possessed" by the claimant if "(1) it has been usually cultivated or improved; (2) it has been protected by a substantial enclosure; [or] (3) although not enclosed, it has been used . . . for the ordinary use of the occupant." *Id.* § 78B-2-211.

The district court noted this alternate branch of adverse possession in its ruling, but the court did not expressly apply it, instead resting its determination on its conclusion that Cutting Edge had openly and notoriously possessed the Properties. In its brief, Cutting Edge cites the adverse possession under written document doctrine and asks us to apply it. While we recognize that the doctrine may well have been applicable, we need not rule on this basis because, as noted, we affirm the court's determination that Cutting Edge openly and notoriously possessed the Properties.

B.      Ouster

¶25     As noted, one of Gene's arguments below was that he was a cotenant on the various parcels at issue and that, as a result, Cutting Edge was required to satisfy an additional requirement in order to show adverse possession. (As we'll discuss below, this additional requirement is often referred to as the "ouster" requirement.) In its ruling, the district court concluded that, according to the applicable pre-1975 deeds, Gene was only a cotenant as to the 14 and 26 Parcels; but then, for purposes of argument only, the court considered the question of whether Cutting Edge had satisfied this additional "ouster" requirement as to the remaining parcels as well. In his opening brief on appeal, Gene challenges the court's conclusion that Cutting Edge had established ouster relating to "the 14 and 26 Parcels." But we see no reversible error with respect to this aspect of the court's ruling.[10]

¶26     It's well-settled in Utah that when adverse possession is asserted against a cotenant, the claimant must make an additional showing to establish adverse possession. As explained by our supreme court over a century ago,

> before adverse possession by one tenant in common against another can begin, the one in possession must, by acts of the most open and notorious character, clearly show to the world, and to all having occasion to observe the condition and

10. After Cutting Edge pointed out that Gene's ouster arguments in his opening brief were limited to the 14 and 26 Parcels, Gene made additional arguments relating to the other parcels in his reply brief. But it was too late for him to do so, and we do not consider those arguments. *See State v. Lorenzo*, 2015 UT App 189, ¶ 12, 358 P.3d 330 ("It is well settled that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." (quotation simplified)).

occupancy of the property, that his [or her]
possession is intended to exclude, and does exclude,
the rights of his [or her] cotenant.

*McCready v. Fredericksen*, 126 P. 316, 320 (Utah 1912) (quotation simplified); *see also Massey v. Prothero*, 664 P.2d 1176, 1180 (Utah 1983) (reiterating and applying the same standard).

¶27 This heightened requirement is generally referred to as the "ouster" requirement. *See McCready*, 126 P. at 320. Importantly, "it is not necessary . . . to give actual notice of this ouster"; rather, the ousting cotenant must just "bring it home" to the other cotenant—meaning, the "implication of" the conduct in question "cannot escape the notice of the world about him [or her], or of any one, though not a resident in the neighborhood, who has an interest in the property, and exercises that degree of attention in respect to what is his [or hers] that the law presumes in every owner." *Id.* (quotation simplified).

¶28 Of note, our supreme court held in *McCready* that an ouster can occur when a cotenant is in "possession under [a] deed, claiming title to the whole property, for the time required by the statute of limitations." *Id.* And in *Holbrook v. Carter*, the supreme court further referred to the "general rule of law" that an ouster occurs where one cotenant "conveys the joint estate by an instrument purporting to vest the fee to the entire property in a grantee who is not a co-tenant." 431 P.2d 123, 124 (Utah 1967). Here, it is unquestioned that Georgia executed deeds to Cutting Edge for the 14 and 26 Parcels. It is likewise unquestioned that, after Georgia executed these deeds, Cutting Edge claimed title for seven years. Under our caselaw, this was enough to constitute an ouster.

¶29 Pushing back, Gene first claims that there is some dispute about whether the deeds conveyed a 100% interest in these parcels, and he further claims that because "a grantor may only convey property to such extent that she owns the property, Georgia's purported deed[s] [do] not constitute an ouster." But

the district court found that the deeds that conveyed the 14 and 26 Parcels to Cutting Edge "did not merely purport to convey a fractional interest or a certain portion of the 14 and 26 Parcels; instead, they expressly conveyed the entirety of both parcels." And in his reply brief, Gene expressly stated that he was not challenging the district court's factual findings.

¶30 At oral argument, however, Gene nevertheless suggested that this finding did not matter because, in his view, the question of whether the deeds conveyed the entirety of the parcels was a legal question. As noted, however, the question here is whether, "under [a] deed," Cutting Edge "*claim*[*ed*] title to the whole property," *McCready*, 126 P. at 319 (emphasis added), or, stated another way, whether the deeds "*purport*[*ed*] to vest the fee to the entire property in a grantee who is not a co-tenant," *Holbrook*, 431 P.2d at 124 (emphasis added). These qualifiers make sense, because a deed that purported to convey the whole interest in the property would "clearly show to the world, and to all having occasion to observe the condition and occupancy of the property," that the deed was "intended to exclude, and [did] exclude, the rights" of the cotenant. *McCready*, 126 P. at 320 (quotation simplified). Gene's claim thus likely fails for this reason alone.

¶31 Regardless, under Utah Code section 57-1-3, "[a] fee simple title is presumed to be intended to pass by a conveyance of real estate, unless it appears from the conveyance that a lesser estate was intended." Gene has pointed to no evidence indicating that Georgia intended, at the time of the conveyances, to convey anything less than the full estate. *Cf. Olwell v. Clark*, 658 P.2d 585, 586, 589 (Utah 1982) (concluding that no ouster had occurred where contemporaneous writings referenced a "one-sixth" interest as opposed to the whole interest). For this reason too, we see no basis for reversing the district court's ouster determination based on the deeds allegedly not having conveyed full title.

¶32 Gene next claims that, at the time of the conveyances, Cutting Edge at least had "actual knowledge that [Gene] claimed a fifty-percent (50%) undivided interest in the parcels and had previously and continued to assert his legal rights thereto." Gene

argues that these deeds could not have "brought it home" to him that he was being ousted because they were executed by Georgia; in Gene's view, what matters here is that in some iteration of the prior litigation (presumably the 1987 Lawsuits), Georgia had allegedly agreed that Gene owned a 50% interest in the Properties.

¶33     But by all accounts, any statements made by Georgia in the prior litigation predated the conveyances discussed above, which, again, purported to convey the entire ownership of the parcels to Cutting Edge. Gene has pointed to no authority holding that an ousting tenant's pre-conveyance statements about the cotenant's ownership somehow preclude any subsequent ouster from occurring as a result of an otherwise clear future conveyance. Moreover, as Cutting Edge points out, it did not ultimately matter what Cutting Edge knew or believed. Rather, again, under Utah caselaw, an ouster occurs where one cotenant "conveys the joint estate by an *instrument purporting to vest* the fee to the entire property in a grantee who is not a co-tenant." *Holbrook*, 431 P.2d at 124 (emphasis added). Thus, what matters here are the deeds themselves. And again, these deeds purported to convey the full ownership of the various parcels.

¶34     For these reasons, we are not persuaded that the district court committed reversible error in concluding that Cutting Edge had ousted Gene in relation to these two parcels.

CONCLUSION

¶35     We affirm the district court's determination that Cutting Edge adversely possessed the Properties. As a result, we need not address the remaining issues raised by the parties, and we likewise affirm the district court's order quieting title in Cutting Edge.

———————